HARPER *v.* BRENNAN.

1. COURTS—FEDERAL QUESTIONS—SUPREME COURT OF THE UNITED STATES.
>  A State supreme court is bound to follow the prevailing opinions of the supreme court of the United States where Federal questions are involved.

2. CONSTITUTIONAL LAW—FREEDOM OF SPEECH—PEACEFUL PICKETING.
>  Under the constitutional guaranty of freedom of speech a labor union may publicize the facts of a labor dispute by the process of peaceful picketing and there need not be a dispute between an employer and his employees in order to entitle such union to picket peacefully as an exercise of such right (U. S. Const. Ams. 1, 14; Mich. Const. 1908, art. 2, § 4).

3. INJUNCTION—PICKETING—MONOPOLY—VIOLATION OF STATUTE—COERCION BY UNION—LABOR OBJECTIVE.
>  Plaintiff partnership which had no employees other than the partners and which firm conducted a funeral home was entitled to injunction restraining defendant union from picketing the establishment where, per WIEST, SHARPE, and BOYLES, JJ., contract which defendants sought to continue in force created a monopoly in violation of State statute, and where, per NORTH, BUTZEL, and REID, JJ., by picketing and coercion defendant union in violation of statute pertaining to

labor disputes sought to compel the firm members to continue union affiliation and to pay monthly union dues, an unlawful labor objective (3 Comp. Laws 1929, § 16668; Act No. 176, § 17, Pub. Acts 1939).

4. SAME—PICKETING—PARTY IN INTEREST.

Association which had no material interest in whether or not defendant labor union maintained picket line at business establishment whose owners were members of the association was not entitled to relief in suit by such members to enjoin such picketing.

STARR, C. J., and BUSHNELL, J., dissenting in part.

Appeal from Wayne; O'Hara (Chester P.), J. Submitted June 14, 1944. (Docket No. 58, Calendar No. 42,749.) Decided May 14, 1945. Rehearing denied June 29, 1945.

Bill by Josiah Harper and others, copartners doing business as the Harper-Mulligan Funeral Home, and Michigan Funeral Directors & Embalmers Association, a Michigan nonprofit corporation, against Bert Brennan and others to have a contract declared null and void and for injunctive relief. Decree for defendants. Plaintiffs appeal. Reversed.

*Clark, Klein, Brucker & Waples,* for plaintiffs.

*Fitzgerald, Hogue, O'Leary & Reardon,* for defendants.

SHARPE, J. This is an action by plaintiffs Harper, Mulligan and Kettler, doing business as the Harper-Mulligan Funeral Home, and Michigan Funeral Directors & Embalmers Association, to enjoin defendants from boycotting, picketing and interfering with plaintiffs' interests, and also to have a certain contract declared void.

The salient facts are not in dispute. Plaintiffs Harper, Mulligan and Kettler are licensed funeral directors and embalmers in Highland Park, Michigan. They have no employees. They do their own

work as funeral directors and embalmers. The Michigan Funeral Directors & Embalmers Association is a Michigan nonprofit corporation composed of funeral directors and embalmers. The defendant "Teamsters Union" is a labor union affiliated with the American Federation of Labor. Defendants Brennan and Hoffa are officers of the union, and defendants Cassily and Coleman are field representatives thereof.

In 1940 this union entered what may be termed the "funeral field," when certain manufacturers of caskets entered into contracts with the union, and their employees became affiliated therewith. In 1941 certain wholesale and retail florists became affiliated with the union, and later certain service companies, service embalmers and funeral directors also became affiliated with the union. Towards the close of the year 1942 all of the casket companies and their employees, except one, within the jurisdiction of this union; all wholesale florists except one; practically all of the service companies providing hearses and other equipment for funerals; 19 independent service embalmers; and certain retail florists and funeral directors had signed contracts and thereby became affiliated with the union. Approximately 150 funeral homes, their directors or owners, were members of the union in January, 1944.

The contract between plaintiffs and the union provided:

"Article 14

"The employer shall not request or instruct any employee to go through a picket line of a striking union. The employer further agrees not to handle any merchandise of a union or nonunion company involved in a labor dispute.   *   *   *

"Article 16

"It is further agreed and understood between both parties hereto, that this agreement shall be

binding upon both parties until the — day of — A. D., 194—, and in the event either party shall wish to terminate this contract or any clause therein, notice shall be given in writing to the other party not less than 30 days prior to the expiration date of the contract. Termination of any specified clause shall not cancel the remainder of the agreement unless so stated. If no such notice is given, contract shall automatically continue for one year.''

At the end of one year plaintiffs ceased paying union dues, and after demand for the same was ignored their funeral home was picketed and the companies with whom plaintiffs did business, including the casket companies, undertaker service companies and the florist companies, were instructed that there was a labor dispute between plaintiff funeral home and the union and were requested to recognize the picket line according to their contracts. These instructions were obeyed and plaintiffs then filed the present bill of complaint for an injunction and other relief. The trial court granted a temporary injunction, and, after hearing the evidence, filed an opinion in which it found that plaintiffs signed a contract with the union November 4, 1942; that plaintiffs fulfilled the terms of the contract during the first year of its existence; that plaintiffs made no complaint concerning any of the provisions contained in the contract prior to January, 1944; that there was no evidence of any violence, coercion, fraud or duress exercised by the union during the continuation of the contract until the middle of January, 1944; that plaintiffs paid their dues during the entire year and until November 1, 1943, and that the union did not attempt to prevent anyone from doing business with plaintiffs except concerns which were under contract with the union and whose employees were members thereof; and that the union had authority to negotiate and close contracts with

persons engaged in the "funeral field" under its charter from the American Federation of Labor.

The trial court held that the contract was not null and void; that a labor union may use peaceful means to accomplish a lawful purpose, i. e., in procuring the cooperation of its members and of the concerns with which it had contracts to refuse to supply their services or products to plaintiffs during their labor trouble; that the facts in this case bring the actions of the union within the term of "primary boycott," which is a lawful undertaking; and that the acts of the union do not constitute a violation of the Michigan statutes relating to restraint of trade and monopoly.

Plaintiffs appeal and urge that a labor dispute, to be lawful, must involve a bona fide controversy over wages, hours, health, safety, collective bargaining or other conditions of employment for the protection of labor from abuses; that in order to justify picketing or boycotting there must be a labor dispute and that in the case at bar there is no labor dispute; that a labor union is subject to State antitrust law and that the provisions in the contracts between the union and the various funeral supply companies are an unlawful combination of union and nonlabor groups in violation of the monopoly statutes of Michigan.

The paramount question in this case relates to the manner or method, if any, of enjoining peaceful picketing. We have in mind that where Federal questions are involved we are bound to follow the prevailing opinions of the United States supreme court. (See *People* v. *Lechner,* 307 Mich. 358.)

We recognize that under the constitutional guaranty of freedom of speech* a labor union may publicize the facts of a labor dispute by the process of

---

* See U. S. Const. Ams. 1, 14; Mich. Const. 1908, art. 2, § 4.—RE-PORTER.

peaceful picketing (see *Book Tower Garage, Inc.,* v. *Local No. 415, International Union, U. A. W. A. (C. I. O.),* 295 Mich. 580; and *People* v. *Bashaw,* 295 Mich. 503), nor is it necessary that there be a dispute between an employer and his employees in order to entitle a union to picket peacefully as an exercise of such right of free speech.

In *American Federation of Labor* v. *Swing,* 312 U. S. 321 (61 Sup. Ct. 568, 85 L. Ed. 855), there was no labor dispute between Swing and his employees. Defendant union had peacefully picketed plaintiff's beauty parlor in order to induce him to require his employees to become union members. The court there said:

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech.   *   *   * The scope of the Fourteenth Amendment is not confined by the notion of a particular State regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the State. A State cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *   *   * The right of free communication cannot therefore be mutilated by denying it to workers in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in *Thornhill's Case* (*Thornhill* v. *Alabama,* 310 U. S. 88 [60 Sup. Ct. 736, 84 L. Ed. 1093])."

In *Milk Wagon Drivers' Union of Chicago Local 753* v. *Meadowmoor Dairies, Inc.,* 312 U. S. 287 (61 Sup. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200), the court held that peaceful secondary picketing—that is, picketing of an employer's industrial customers, —is an exercise of the right of free speech. (See, also, *Bakery & Pastry Drivers & Helpers Local 802 of the International Brotherhood of Teamsters* v. *Wohl,* 315 U. S. 769 [62 Sup. Ct. 816, 86 L. Ed. 1178]). However, the above doctrine enunciated by the supreme court of the United States is not without its exceptions. In the *Meadowmoor Case, supra,* it was also held that a State can authorize its courts to enjoin acts of picketing when they are enmeshed with contemporaneously violent conduct.

In the *Wohl Case, supra,* p. 775, it is said: "A State is not required to tolerate in all places and all circumstances even peaceful picketing by an individual."

In *Carpenters' & Joiners' Union of America, Local No. 213,* v. *Ritter's Cafe,* 315 U. S. 722 (62 Sup. Ct. 807, 86 L. Ed. 1143), it was held that the constitutional guaranty of free speech did not forbid injunction against peaceful secondary picketing when carried on against persons or establishments having no industrial connection with the original labor dispute. The court there said:

"In the circumstances of the case before us, Texas has declared that its general welfare would not be served if, in a controversy between a contractor and building workers' unions, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a. business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder. The precise question is, therefore, whether the Fourteenth Amend-

ment prohibits Texas from drawing this line in confining the area of unrestricted industrial warfare.   *   *   *

"It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute peaceful picketing may be a phase of the constitutional right of free utterance. But the recognition of peaceful picketing as an exercise of the right of free speech does not imply that the States must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the States the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the due process clause would compel the States to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose."

In *Lafayette Dramatic Productions, Inc.*, v. *Ferentz,* 305 Mich. 193 (145 A. L. R. 1158), defendant union threatened to prevent the opening and operation of a theater unless plaintiff theater would sign a contract for the employment of musicians which it did not need or desire to employ and could not afford. We there said (pp. 207, 213):

"It is plain that defendants' demand that plaintiff employ musicians had no reasonable connection with any dispute or controversy relating to wages, working conditions, hours of work, health, safety, the right of collective bargaining or the protection of labor from abuses.   *   *   *

"In the present case defendant musicians' union induced defendant stagehands' union to join in a

combination to force plaintiff either to employ musicians or to discontinue its theater. We are satisfied that defendants' purpose was to accomplish an unlawful labor objective.''

In the above case we quoted with approval from *Opera on Tour, Inc.,* v. *Weber,* 285 N. Y. 348 (34 N. E. [2d] 349, 136 A. L. R. 267); certiorari denied, 314 U. S. 716 (62 Sup. Ct. 477, 86 L. Ed. 570).

In *Silkworth* v. *Local No. 575 of the American Federation of Labor,* 309 Mich. 746, defendant union insisted that plaintiff place all their drivers in the union by paying their initiation fees. Upon refusal of plaintiff company to accede to this demand defendant established a picket line. Drivers of other companies refused to cross the picket line in order to deliver merchandise to plaintiff company. We there said (p. 758):

''Therefore, in the present case we must determine whether or not defendants' picketing of plaintiffs' storage plant was for the purpose of obtaining a lawful labor objective. The motive for the picketing, that is, the result sought to be accomplished, was a question of fact. The testimony is convincing that defendants' real objective was to compel plaintiffs to put their drivers in defendant union by paying their initiation fees, regardless of whether or not the drivers wished to join. This was not a lawful labor objective. Defendants could not use the lawful means of peaceful picketing to accomplish such unlawful purpose.''

From the above authorities it is evident that the constitutional guaranty of free speech does not forbid injunction against peaceful secondary picketing carried on against persons or establishments under all circumstances. Peaceful picketing is not immune from regulations that will protect the interests of the public.

It is urged by plaintiffs that the provisions in the contract between the union and the various funeral supply companies are an unlawful combination of union and nonlabor groups in violation of the monopoly statutes of Michigan.

3 Comp. Laws 1929, § 16668 (Stat. Ann. § 28.62), provides:

"All combinations of persons, copartnerships, or corporations made and entered into for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession or business, are hereby declared to be against public policy and illegal and void."

Defendants urge that the above statute does not apply to the facts in the case at bar as its purpose is not to control prices or establish and maintain a monopoly of any trade.

In declaring a public policy the legislature made no distinction between combination of workers and combination of employers. As the statute was designed for the protection of the public, we hold that the statute may apply to labor unions as well as to other organizations.

There can be no question that the creation of a monopoly is not a lawful labor objective. Of importance is the question of whether the activities of the union in organizing the various units of the funeral industry created such a monopoly as is forbidden by the statutes of Michigan. In *People, ex rel. Attorney General,* v. *Detroit Asphalt Paving Co.,* 244 Mich. 119, we said:

"A monopoly exists where all or so nearly all of an article of trade or commerce within a community or district is brought within the hands of one man or set of men, as to practically bring the handling

or production of the commodity or thing within such single control, to the exclusion of competition or free traffic therein. Cooke on Combinations, Monopolies & Labor Unions (2d Ed.), § 116, and cases there cited."

In *Hinton* v. *Columbia River Packers Ass'n* (C. C. A.), 131 Fed. (2d) 88, 90 per cent. of the fishermen operating along the coast of Oregon were members of defendant union. They controlled the production of fish to such an extent that appellee, engaged in purchasing, processing and distributing fish, could not operate its business unless it entered into a contract with the union, promising and agreeing to purchase no fish from anyone except a member of the union. The district court declared the contract which the union was demanding of plaintiff, as a condition of selling it any fish, to be illegal. Defendants were enjoined from interfering with plaintiffs' property or business. While the finding of illegality in the contract was based on the Sherman anti-trust act, 15 USCA, § 1 *et seq.*, which act is not under consideration in the case at bar, yet the underlying principles in each case are similar.

The district court said in the same case (see 34 Fed. Supp. 970):

"The exclusive buying clause in the union's contract, which forbids plaintiff from buying fish from others than members of the defendant union, and the clauses in the union's constitution and by-laws which forbid union members from selling to plaintiff and to others not contracting with the union on the exclusive terms demanded, are, in my view, in restraint of trade and void.    *    *    *

"Surely reasonable men will agree that the public's interest in an important item of food supply should not be put in such jeopardy. If an exclusive and monopolistic arrangement, as here insisted

upon, can be legally made as to fish, it can be made as to milk, as to meat, and as to other necessities of life."

In *Hunt* v. *Riverside Co-operative Club,* 140 Mich. 538 (112 Am. St. Rep. 420), we said:

"In determining the legality of defendants' undertaking it would be confusing, rather than helpful, to examine and determine the legality of each specific agreement. If it may be said that many of these agreements, considered by themselves, are legal, it may also be said (and this will be made to appear hereafter) that these agreements are merely steps to effect the accomplishment of an illegal object, and for that reason they are also illegal. See *Pacific Factor Co.* v. *Adler,* 90 Cal. 110 (27 Pac. 36, 25 Am. St. Rep. 102). The legality of defendants' undertaking is to be determined by ascertaining their central and controlling object."

In the case at bar the union seeks to enforce a contract and the payment of dues, as defined in that contract. There is no dispute about wages, hours, health, safety, the right of collective bargaining or any other condition of employment. By its contract the union has organized all units of the "funeral field." Any claimed infraction of the contract on the part of the funeral directors, or other units under contract, could result in a paralysis of the funeral industry. We note that the district organized is composed of practically one-third of the population of Michigan, which adds importance to the seriousness of the question involved. Such a contingency, made possible by the clauses in the contracts, is not in harmony with the public policy of this State. The clauses in the contract contain the power to create a monopoly and are void because of that purpose. The union may not establish a picket line to enforce void provisions in a contract.

The constitutional right of free speech does not preclude the enforcement of the State's monopoly laws in cases where there is no labor dispute nor any interdependence of economic interest between disputants engaged in the same industry.

There is no attempt in this opinion to interfere with the right of the union to enforce other elements of the contract involved in this case, or with the right of labor to make known its side of an industrial controversy, as defined in *American Federation of Labor* v. *Swing, supra,* and *Cafeteria Employees Union, Local 302,* v. *Angelos,* 320 U. S. 293 (64 Sup. Ct. 126, 88 L. Ed. 58), but in our opinion the trial court was in error in holding that the clauses in the contract above referred to did not have the power to create a monopoly. We conclude that the contract did create a monopoly in all the essentials of the funeral field.

The decree of the trial court is reversed, and a decree will be entered cancelling and annulling the mentioned clauses in the contract. The injunction heretofore granted will be continued for the purpose of enjoining the union from picketing plaintiffs' establishment for the purpose of enforcing that part of the contract held void by this opinion.

Plaintiffs Harper, Mulligan and Kettler may recover costs.

WIEST and BOYLES, JJ., concurred with SHARPE, J.

NORTH, J. (*concurring*). The instant case is fraught with such serious consequences that I am constrained to supplement that which has been written by my Brethren. Basically this appeal discloses reliance by the respective litigants upon asserted but conflicting constitutional rights, and such rights of the one must be construed with due regard to the

constitutional rights of the other. This concept is not at all novel. For example, freedom of speech and of the press are guaranteed by the Constitution, but in the exercise of neither of these rights may one with impunity indulge in slander, libel, extortion or unlawful coercion.

Except as otherwise indicated we herein designate the Harper-Mulligan Funeral Home and the three individuals composing that partnership as plaintiffs. These plaintiffs, who have no employees, assert the constitutional right to conduct in a lawful manner their business as funeral directors and embalmers without molestation or restraint by defendants. In *Lafayette Dramatic Productions, Inc.*, v. *Ferentz*, 305 Mich. 193 (145 A. L. R. 1158), we held, as stated in the syllabus:

"The right to enter into and conduct a legitimate business for profit has been and still is, except in time of war, a fundamental concept under the American doctrine of free enterprise."

And in *Baldwin* v. *Escanaba Liquor Dealers' Association*, 165 Mich. 98, 113, it is stated:

" 'A person's occupation or calling, by means of which he earns a livelihood and endeavors to better his condition, and to provide for and support himself and those dependent upon him, is property within the meaning of the law, and entitled to protection as such.' "

For reasons disclosed in the opinions of my Brothers, defendants for a time picketed and now assert the right to picket plaintiffs' place of business. Defendants contend that, since such picketing is peaceable, it is a lawful exercise of their constitutional right of free speech, notwithstanding it will prevent plaintiffs from carrying on their business. Thus in the asserted lawful exercise of their claimed

respective constitutional rights, these litigants have come into conflict. But their asserted rights are relative rights, and determination of defendants' right to picket must be made in the light of the facts of this particular case, as should be done in all controversies of this type. *Baldwin* v. *Escanaba Liquor Dealers' Association, supra,* 111; *Roy* v. *Chevrolet Motor Car Co.,* 262 Mich. 663.

Peaceable picketing incident to a legitimate labor objective is lawful. *Book Tower Garage, Inc.,* v. *Local No. 415, International Union, U. A. W. A. (C. I. O.),* 295 Mich. 580. Otherwise it is not lawful. *Silkworth* v. *Local No. 575 of the American Federation of Labor,* 309 Mich. 746. It was there said:

"While recognizing the right to picket peacefully for the purpose of publicizing the facts of a labor dispute, as established by the above authorities, we also recognize that such picketing may become unlawful if directed to the accomplishment of an unlawful purpose. In *Lafayette Dramatic Productions, Inc.,* v. *Ferentz, supra,* we said (p. 208): 'If the object sought to be obtained by defendants was not a lawful labor objective, the court would be justified in exercising control of their acts.' "

It therefore becomes essential to determination of the instant case whether under this record there appears a legitimate labor objective in justification of picketing by the defendants' union or its officers. Broadly, but fairly accurately, it may be stated that to justify picketing a place of business the proprietor thereof or his employees must be involved in a legitimate labor dispute concerning wages, hours, safety, health, right of collective bargaining or some condition of employment for the protection of labor from abuses. See *Lafayette Dramatic Productions, Inc.,* v. *Ferentz, supra.* In a decision of the New York court it was said:

"This complaint (seeking injunctive relief), therefore, is sufficient as such, unless the purpose of the defendant-union must be presumed to be a lawful labor objective,—an activity having some reasonable connection with wages, hours, health, safety, the right of collective bargaining or some other condition of employment." *American Guild of Musical Artists, Inc.*, v. *Petrillo*, 286 N. Y. 226 (36 N. E. [2d] 123).

Careful review of this record brings the conclusion that there was no controversy whatever between these litigants amounting to or involving a lawful labor objective. Plaintiffs had no regular employees and there was no controversy between plaintiffs and any persons in their employ. Nor is there any showing of injurious business competition between plaintiffs and other funeral directors or embalmers or others who are members of defendants' union. It necessarily follows that no lawful labor objective is sought to be accomplished by picketing plaintiffs' place of business. Instead, the sole purpose sought to be accomplished by such picketing is to coerce plaintiffs into signing or continuing a contract in consequence of which plaintiffs would become or continue as members of the defendants' union and be obligated to pay dues of $2 per month. That alone is not, under the circumstances of this case, a lawful labor objective. Plaintiffs' nonmembership does not, in so far as disclosed by this record, adversely affect the rights of any group represented by defendants; or at least any such adverse result is inconsequential as compared with plaintiffs' right to pursue unmolestedly their lawful occupation. It is important to note that the controversy between these parties did not arise from plaintiffs' refusal to enter into a contract with defendants to maintain a "closed shop;" but instead

defendants insist that plaintiffs should become or continue to be dues-paying members of defendant union. In defendants' brief it is stated that when in January, 1944, Mr. Hoffa, a representative of the union, interviewed Mr. Mulligan: "Mr. Mulligan told him (Hoffa) that he had been advised not to pay these dues. Hoffa then told him that he either had to pay his dues or they would use legal means to compel such payment."

Since plaintiffs had no regular employees we cannot agree with defendants' contention: "that a 'unity of interest' exists in all of these companies and individuals (affiliated with defendant union) in the funeral service field;" at least not such a "unity of interest" as brings plaintiffs within the legitimate field of labor organization. Such lack of unity clearly appears from the undisputed fact that plaintiffs are not operators or drivers of funeral conveyances nor are they in the business of merchandising caskets, vaults, or flowers. In fact, these plaintiffs seek in this case, as above stated, to have defendants enjoined from preventing plaintiffs from securing from defendants' affiliated members such service and merchandise. But defendants propose to prevent this unless plaintiffs become or continue as members of the union and obligate themselves to payment of union dues. We do not overlook that when occasion requires plaintiffs employ embalmers. But defendants do not charge plaintiffs with employing on such occasions nonunion embalmers. Instead defendants state in their brief: "They (plaintiffs) employ independent service embalmers from this area, who are affiliated with this union, when they need assistance, and this happens quite frequently." No complaint is made that the employment of such employees by plaintiffs is not in full accord with union standards. As

stated above the primary purpose of the picketing in this case is not to establish a closed shop or to protect or improve the interests of labor, but only to compel plaintiffs to pay monthly union dues. If defendants' purpose in this respect is sound and were to be carried to its logical conclusion, the defendant union could lawfully picket the home of any bereaved family in an effort to prevent procurement by such family of needed funeral service except the head of the household joined the union. Even the right of free speech, upon which defendants base their contention, must have some limitation where it impinges upon conflicting rights of equal or greater gravity.

It is indeed an unique aspect of this case that instead of plaintiffs refusing to use the services or merchandise of the various members of defendants' union, plaintiffs herein are seeking to have defendants restrained "from interfering with the free flow of supplies, materials or services to plaintiffs by preventing" the members of its union from furnishing their services or merchandise to plaintiffs. The sole controversy asserted by defendants in justification of picketing is plaintiffs' refusal to pay union dues as a condition of dealing with members of defendant union. It is not shown that the economic interests of the union or any of its affiliates are being invaded or injuriously affected by the conduct of its business by the Harper-Mulligan Funeral Home.

In its legal aspect the present case cannot be distinguished from our recent cases of *Lafayette Dramatic Productions, Inc.,* v. *Ferentz, supra,* and *Silkworth* v. *Local No. 575 of the American Federation of Labor, supra.* In this case defendants seek to compel plaintiffs to sign or continue a contract which, so far as disclosed by this record, does not

in any way alter plaintiffs' manner of conducting their business but, as stated above, would merely constitute plaintiffs members of defendants' union and necessitate payment of union dues of $2 per month. No legal labor objective appears. And such was our holding in the *Lafayette Case* wherein the defendant union sought to compel plaintiff to employ union musicians whose services plaintiff did not need. And similarly in the *Silkworth Case,* by picketing plaintiffs' place of business the defendant union sought to compel plaintiffs to pay the union the initiation fee for each of plaintiffs' driver employees. In these cases defendants were enjoined because no legal labor objective was involved. In the above-cited *Lafayette Case* we said:

"Furthermore, defendants may not claim that a bona fide labor dispute is involved when the object they sought to accomplish was an unlawful labor objective. In *Dorchy* v. *Kansas,* 272 U. S. 306 (47 Sup. Ct. 86, 71 L. Ed. 248), Mr. Justice Brandeis said, p. 311: 'A strike may be illegal because of its purpose, however orderly the manner in which it is conducted.'"

In the syllabus of the *Lafayette Case* it is said: "Peaceful picketing is unlawful when the object is in furtherance of a conspiracy to ruin a legitimate business." It quite conclusively appears in the instant case that except plaintiffs are granted relief their established business will be ruined by the course of action defendants propose to pursue. The over-all organization which defendants have perfected in their union, as outlined in the opinions of my Brothers, is such that plaintiffs, unless granted relief, must either comply with defendants' demands or surrender plaintiffs' right to lawfully pursue the business in which they are engaged and submit to its destruction. The record is replete

with convincing testimony of coercive threats. In defendants' brief it is stated: "There was evidence of what might be termed coercive threats by some of the defendants made to the plaintiff Mulligan in January, 1944." And we accept as true the testimony of Mr. Mulligan, the substance of which is quoted in defendants' brief, in the following words:

"He (Mulligan) testified that he was advised that he must either pay his dues by 5 p.m. on January 21, 1944, or the union would put him out of business; that they threatened to form a picket line at his place of business and continue this picket line until he had paid his dues."

William Cavanagh, president of the Michigan Funeral Directors & Embalmers Association, a plaintiff herein, testified that a representative of the union stated to him "that funeral directors and embalmers must join the teamsters union or else be put out of business."

Cyrus Warren, a funeral director and embalmer, testified: "The union said to us at this meeting that we were to 'sign it or else.' * * * We particularly protested the forcing of a funeral director who had no employees to join the union."

A Detroit funeral director, Mr. Fred Wood, testified:

"Cassily (a defendant union representative) called me up and stated that unless we signed the instrument submitted for renewal, we would be put out of business and our supplies would be cut off and we would be unable to continue the operation of a funeral parlor."

The extreme methods to which defendant union had resorted in its unionization campaign were well known to members of the Michigan Funeral Directors & Embalmers Association; and such methods

are indicated by the testimony of Peter Ellis who, as a witness, said:

"They (defendant union) wanted me to sign a contract around Christmas time and I told them that I would not do it. I had a large shipment of Christmas trees on display and one of the union men said in my hearing that a half gallon of gasoline and a match would take care of it."

Notwithstanding the above threatening statement was not made to or in the presence of any of these plaintiffs, nonetheless plaintiffs' knowledge of defendants' conduct in this respect had a very material bearing upon the effectiveness of defendants' coercive attitude in dealing with plaintiffs. Since no lawful labor objective is involved, defendants' course of conduct above noted amounts to coercion, and for the purpose sought to be accomplished such coercion is in violation of the statutory law of this State wherein it is provided:

"It shall be unlawful for any employee or other person by force, coercion, intimidation or threats to force, or attempt to force any person to become or remain a member of a labor organization, or for any employee or person by force, coercion, intimidation or threats, to force or attempt to force any person to refrain from engaging in employment. Violation of this section shall be a misdemeanor and punishable as such." Act No. 176, § 17, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 8628–17, Stat. Ann. 1944 Cum. Supp. § 17.454 [18]).

For the reasons noted we conclude defendants' picketing of plaintiffs' place of business was unlawful and plaintiffs are entitled to have such picketing enjoined.

In arriving at the above conclusion we are mindful of the decisions of the United States supreme

court cited and relied upon by Chief Justice STARR; but we think each of them can be and should be distinguished from the instant case in one or more particulars which render such decisions inapplicable. It is of first importance to note that in none of the cited cases was picketing permitted when it was shown, as is in this case, that such picketing was in direct violation of a valid State statute, such as that above quoted. Act No. 176, § 17, Pub. Acts 1939. Further, for the most part such cases are distinguished from the instant case in the manner indicated in the appellants' brief where it is said:

"In all of the cases where the union was allowed to picket and assert other coercive labor techniques against the employer or businessman, he, himself, was directly related with the union. * * * There was an actual competition,—Senn was laying tile at a lower rate than union employees; Wohl drove a bakery truck in competition with members of the bakery and pastry driver's union, and did so for lower wages and longer hours than the union members; Angelos owned and operated his own cafeteria and worked in competition with members of the union. This is the economic relationship required. The reason for the rule is quite sound. When there is competition among employees so that the conduct of the dissident has a material effect upon the standard of the union employees because he is working in the self-same tasks by which they earn their livelihood, then and then alone is there a right for the union to require membership. But the situation here is entirely different."

In a general way the foregoing quotation refers to the line of cases cited and relied upon by Chief Justice STARR, but more particularly to *Senn* v. *Tile Layers Protective Union*, 301 U. S. 468 (57 Sup. Ct. 857, 81 L. Ed. 1229); *Bakery & Pastry Drivers*

& Helpers Local 802 of the International Brother-
hood of Teamsters v. Wohl, 315 U. S. 769 (62 Sup.
Ct. 816, 86 L. Ed. 1178); and Cafeteria Employees
Union, Local 302, v. Angelos, 320 U. S. 293 (64 Sup.
Ct. 126, 88 L. Ed. 58). In addition to the comment
from appellants' brief the following, as distinguish-
ing the cited cases, may be noted.

Concerning decision in the Senn Case, in which
four Justices dissented, it should be pointed out
that the holding was based upon the conclusion of
the State supreme court that the picketing was
lawful under the State (Wisconsin) statute which
expressly authorized peaceful picketing in any dis-
pute in which a labor union was engaged, and for-
bade issuance of any injunction against such pick-
eting. Michigan has no such statute. The opinion
recites:

"The hearings below were concerned mainly with
questions of State law. * * * The question for
our decision is whether the statute, as applied to
the facts found, took Senn's liberty or property or
denied him equal protection of the laws in violation
of the Fourteenth Amendment. * * * The
judgment of the highest court of the State estab-
lishes that both the means employed and the end
sought by the unions are legal under its law. The
question for our determination is whether either
the means or the end sought is forbidden by the
Federal Constitution. * * * There was no vio-
lence, no force was applied, no molestation or inter-
ference, no coercion."

We think, as hereinbefore indicated, defendants'
contemplated course of conduct in the instant case
was coercive and, in that respect also, this case dif-
fers materially from the Senn Case, wherein the
State court's denial of injunctive relief was af-
firmed. Further, unlike the instant case, the union

was not attempting to coerce Senn to join the union. Instead, under union rules Senn was not even eligible to membership.

In the *Wohl Case* the right of the union to picket was sustained. But the factual background in the *Wohl Case* was so materially different from the factual background in the instant case that there appears to be no conflict between the holding in the *Wohl Case* and our conclusion above noted in the instant case. As pointed out in the above-quoted portion of appellants' brief: "Wohl drove a bakery truck in competition with the members of the bakery and pastry driver's union, and did so for lower wages and longer hours than the union members" who were engaged in a like activity. Clearly that situation presented a lawful labor objective, which we do not find in the instant case. In the conduct of their business these plaintiffs have conformed to union standards. Defendants do not claim otherwise.

The *Angelos Case* in the main bases decision upon the court's holding that the union, in its exercise of the constitutional right of free speech, was justified in *truthfully* advertising by picketing that Angelos was "unfair to organized labor." But in the instant case, under the circumstances disclosed by the record, we think the statement on the signs displayed by the pickets that these plaintiffs were "unfair to labor" was untruthful and used for an ulterior purpose, and therefore should be enjoined. Dissemination of untruths is not a lawful exercise of free speech. In this respect the obviously intended limitation upon the court's opinion in the *Angelos Case* was pointedly expressed as follows:

"Continuing representations unquestionably false and acts of coercion going beyond the mere influence

exerted by the fact of picketing, are of course *not* constitutional prerogatives."

As being somewhat in the same field, Chief Justice STARR cites and to some extent relies upon *American Federation of Labor* v. *Swing*, 312 U. S. 321 (61 Sup. Ct. 568, 85 L. Ed. 855). But, in that case, Swing, engaged in operating a beauty parlor, was employing nonunion help, and the union in this same field "tried to unionize Swing's beauty parlor." The issue as defined by the court in its opinion was as follows:

"We are asked to sustain a decree which for the purposes of this case asserts as the common law of a State that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with' him."

It does not appear nor can it be inferred in the *Swing Case* that the union was attempting to compel Swing to join its ranks and pay dues; and that no other issue was involved, as in the instant case. Instead, in the union's field, organization of beauty parlor employees, a legitimate labor objective, was sought to be accomplished by peacefully publicizing the fact that Swing's employees were not members of the union; and therefore the union's right of picketing was sustained.

Chief Justice STARR, referring in his opinion to our decisions in *Lafayette Dramatic Productions, Inc.*, v. *Ferentz, supra*, and *Silkworth* v. *Local No. 575 of the American Federation of Labor, supra*, says: "In those cases the question of the union's right to picket as an exercise of the constitutional right of freedom of speech was not involved." It

seems to me the above statement is not fully accurate. To be sure "freedom of speech" was not involved in the *Lafayette Case* because that case did not involve picketing, but only a threatened strike incident to which the right of freedom of speech was not involved. Instead that case did involve, without there being a lawful labor objective, coercion by a threatened strike, rather than by an unlawful picketing as in the instant case. But in the *Silkworth Case* the right of freedom of speech was given consideration, as indicated by the following from the syllabi:

"Peaceful picketing is a proper means of exercising the right of free speech."

"Peaceful picketing by a labor union is a proper means by which the facts of a labor dispute may be made known."

Decision in each of these two cases was based upon our holding that a lawful labor objective was not involved, and it is worthy of note that in so holding we had in mind and cited most of the cases cited and relied upon in the instant case by Chief Justice STARR, including the *Senn Case*, the *Wohl Case*, the *Angelos Case*, the *Swing Case*, et cetera. But notwithstanding our consideration given to these decisions of the United States supreme court, they were in effect held inapplicable in a case, such as the instant case, wherein the controversy did not involve a lawful labor objective.

We are not to be understood as holding herein that under all circumstances picketing exceeds the lawful bounds of the constitutional right of freedom of speech and persuasion. Instead we hold that under the circumstances of the instant case defendants' picketing was for a purpose foreign to any

lawful labor objective and under the circumstances of this case was an attempt to accomplish by coercion such purpose.

Because it does not appear that plaintiff, the Michigan Funeral Directors & Embalmers Association, has any material interest in whether or not defendants maintain their picket line at the Harper-Mulligan Funeral Home and because it does not appear that any rights of this particular plaintiff have been invaded, it follows that it is not entitled to any relief in this case.

A secondary or unlawful boycott, as asserted by plaintiffs, is not proven. And since decision of the instant case may be reached without determination of the soundness of appellants' contention that the contract signed by them was void, as being one in restraint of trade or constituting a monopoly, we pass consideration of that issue. In any event it would seem that at the time of our decision herein the contract by its own terms has expired. As entered into by plaintiffs the contract in the first instance was from November, 1942, to November, 1943, with only the following provision for its extension: "If no such notice (in writing of cancellation) is given, contract shall automatically continue for one year." Thus by its own terms the contract expired in November, 1944. In view of this circumstance it is unnecessary to pass upon the somewhat controverted issue as to whether the contract in whole or in part was cancelled by either of the parties thereto.

The decree of the trial court is reversed and plaintiffs may take a decree in this Court enjoining the picketing of the Harper-Mulligan Funeral Home by defendants. Plaintiffs other than the Michigan

Funeral Directors & Embalmers Association will have costs of both courts.

BUTZEL and REID, JJ., concurred with NORTH, J.

STARR, C. J. (*dissenting*).. I cannot agree with Mr. Justice SHARPE's conclusion that the decree of the trial court should be reversed.

The individual plaintiffs, Harper, Mulligan and Kettler (herein referred to as plaintiffs), as copartners, owned and conducted the Harper-Mulligan Funeral Home. They did their own work as embalmers and funeral directors and had no employees. They did not carry a stock of caskets, vaults and other supplies incident to their business, but obtained the same from manufacturers or wholesalers, as required. They did not own ambulances, hearses or funeral cars, but contracted with funeral-service companies to furnish such vehicles, with drivers. Flowers for funerals were delivered by florists. The record reasonably establishes the following finding by the trial court regarding defendant union's organizational activities in the funeral field:

"All of the casket companies except one within the jurisdiction of this particular union (Wayne county) had signed contracts, and their employees had become affiliated, with the union. This was also true of all except one wholesale florist, practically all of the service companies providing hearses and other equipment for funerals, 19 independent service embalmers, and certain retail florists and funeral directors. During the year 1943 two other service embalmers became members of the union, thereby making all independent service embalmers in the area except one member [s] of this particular union. Approximately 150 funeral homes and the

directors or owners thereof were members of this teamsters union in January, 1944, having contracted with or joined the union prior to or about November 1, 1942, or during 1943.''

In November, 1942, plaintiff Mulligan, as the representative of the partnership, signed an application for membership in defendant union and in behalf of the partnership signed the union contract involved in the present suit, which provided in part as follows:

"Article 14

"The employer shall not request or instruct any employee to go through a picket line of a striking union. The employer further agrees not to handle any merchandise of a union or nonunion company involved in a labor dispute. * * *

"Article 16

"It is further agreed and understood between both parties hereto, that this agreement shall be binding upon both parties until the — day of —, A. D. 194—, and in the event either party shall wish to terminate this contract or any clause therein, notice shall be given in writing to the other party not less than 30 days prior to the expiration date of the contract. Termination of any specified clause shall not cancel the remainder of the agreement unless so stated. If no such notice is given, contract shall automatically continue for one year.''

Plaintiffs paid union dues and continued under the contract for one year. When they thereafter refused to pay dues and continue their union affiliation, defendants established a picket line at their place of business. Upon the union's request its affiliates and members in the funeral field refused to cross the picket line and to supply plaintiffs with merchandise.

In his opinion reversing the trial court, Justice Sharpe determines that the contract in question created a monopoly in the funeral field and that a decree should be entered canceling the above-quoted provisions of the contract and enjoining the union from picketing plaintiffs' place of business. He bases his decision on the stated conclusion that the provisions of the contract "contain the power to create a monopoly and are void because of that purpose" under 3 Comp. Laws 1929, § 16668 (Stat. Ann. § 28.62), which provides:

"All combinations of persons, copartnerships, or corporations made and entered into for the purpose and with the intent of establishing and maintaining or of attempting to establish and maintain a monopoly of any trade, pursuit, avocation, profession or business, are hereby declared to be against public policy and illegal and void."

Such decision is clearly erroneous, because in the present case there was no proof of any combination for the purpose of or with the intent of establishing and maintaining a monopoly of business in the funeral field. The sole purpose of the picketing and of the concerted action of defendant union and its affiliates was to induce plaintiffs to continue their union membership. Furthermore, statutes prohibiting restraint of trade and monopolies have consistently been held to apply only where such restraint or monopoly resulted in price fixing or the stifling of competition. In the present case there was no effort to fix prices or stifle competition. In considering the above-quoted statute against monopoly, in the case of *People, ex rel. Attorney General, v. Detroit Asphalt Paving Co.,* 244 Mich. 119, 122, 123, we approved the following definitions:

" ' "A monopoly, in the modern sense, is created when, as a result of efforts to that end, previously competing businesses are so concentrated in the hands of a single person or corporation, or a few persons or corporations acting together, *that they have power to practically control the prices of commodities and thus to practically suppress competition.*" *United States* v. *American Tobacco Co.,* 164 Fed. 700, 721, and cases there cited.

" ' "A monopoly exists where all or so nearly all of an article of trade or commerce within a community or district is brought within the hands of one man or set of men, as to practically bring the handling or production of the commodity or thing within such single control, *to the exclusion of competition* or free traffic therein." Cooke on Combinations, Monopolies and Labor Unions (2d Ed.), § 116, and cases there cited.' "

See, also, *Attorney General, ex rel. James,* v. *National Cash Register Co.,* 182 Mich. 99, 107 (Ann. Cas. 1916 D, 638).

The Sherman anti-trust act (26 Stat. at L. 209, as amended by 38 Stat. at L. 730 and 50 Stat. at L. 693 [15 USCA, § 1 *et seq.*]) was designed to prevent combinations, monopolies and conspiracies in restraint of trade in interstate commerce. The anti-monopoly and restraint of trade statutes of Michigan and other States were enacted to prevent like evils in intrastate commerce. In determining that the Sherman act was not applicable to a strike by unionized employees, the supreme court of the United States said, in the case of *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 500, 503, 504 (60 Sup. Ct. 982, 84 L. Ed. 1311, 128 A. L. R. 1044):

"Restraints on competition or on the course of trade in the merchandising of articles moving in

interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition.   *   *   *

"This is not a case of a labor organization being used by combinations of those engaged in an industry as the means or instrument for suppressing competition or fixing prices.   *   *   *   *Here it is plain that the combination or conspiracy did not have as its purpose restraint upon competition in the market for petitioner's product. Its object was to compel petitioner to accede to the union demands.*   *   *

"Since, in order to render a labor combination effective it must eliminate the competition from nonunion made goods,   *   *   *   an elimination of price competition based on differences in labor standards is the objective of any national labor organization. *But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman act.* See *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103 (53 Sup. Ct. 549, 77 L. Ed. 1062) ; cf. *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209 (42 Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360) ; *National Association of Window Glass Mfrs.* v. *United States,* 263 U. S. 403 (44 Sup. Ct. 148, 68 L. Ed. 358). And in any case, the restraint here is, as we have seen, of a different kind and has been not shown to have any actual or intended effect on price or price competition."

In *Allen Bradley Co.* v. *Local Union No. 3, International Brotherhood of Electrical Workers* (C. C. A.), 145 Fed. (2d) 215, the plaintiffs, who were manufacturers of electrical equipment and whose factories were located outside the New York City area, began suit to enjoin certain alleged illegal activities of defendant union. In determining that

the Sherman anti-trust act, *supra,* section 20 of the
Clayton act (38 Stat. at L. 738, § 20 [29 USCA,
§ 52]), and sections 4 and 13 of the Norris-
LaGuardia act (47 Stat. at L. 70, §§ 4, 13 [29 USCA,
§§ 104, 113]) were not applicable to the union's
activities, the court said in part (pp. 218, 220, 221):

"The situation disclosed by the findings is that
of an entire industry in a local (New York City)
area, quite dominated and closed to outsiders by a
powerful union, whose members receive as a result
exceedingly higher wages, shorter working hours,
and improved working conditions, and whose co-
partners—the local manufacturers and contractors
—also gain by the greater profits achieved through
the stifling of competition. This has been accomp-
lished by the traditional labor weapons of refusal
to work upon disfavored goods, with peaceful and
nonviolent persuasion, picketing, and black-listing,
and now the active participation of the local em-
ployers. The boycott, however, is virtually com-
plete against manufacturers, such as plaintiffs, who
have no working agreements with Local 3.   *   *   *

"For half a century and against strong popular,
political, and legislative pressure, the courts strug-
gled to resolve the anomaly of applying a statute
forbidding combinations in restraint of trade to a
social organism which must depend on united ef-
fort for its existence and upon at least certain re-
straints of trade as a reason for its being. Finally,
at long length the supreme court boldly announced
what must be taken as an abandonment of the at-
tempt. The case which most significantly marks
this change is *United States* v. *Hutcheson,* 312 U. S.
219, 231, 236 (61 Sup. Ct. 463, 466, 468, 85 L. Ed.
788).   *   *   *   Hereafter, following the terms of
these acts, it can no longer be considered illegal
for any person or persons, singly or in concert, to
cease or refuse to perform any work or labor or
peacefully to persuade any person to work or ab-

stain from working, or to cease to patronize any party to such a (labor) dispute, or to recommend, advise, or persuade others by peaceful and lawful means so to do." (See authorities cited.)

See, also, *United States* v. *Hutcheson*, 312 U. S. 219 (61 Sup. Ct. 463, 85 L. Ed. 788); *Appalachian Coals, Inc.*, v. *United States*, 288 U. S. 344 (53 Sup. Ct. 471, 77 L. Ed. 825); *Hunt* v. *Brotherhood of Transportation Workers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America*, 47 Fed. Supp. 571; 26 Cornell Law Quarterly, p. 191.

In support of his decision that the activities of defendant union and its affiliates, under the above-quoted provisions of their contract with plaintiffs, would constitute a monopoly in violation of our State statute, Justice Sharpe cites *Hinton* v. *Columbia River Packers Ass'n, Inc.* (C. C. A.), 131 Fed. (2d) 88. This case was first heard in the United States district court, which granted an injunction against the union's activities. 34 Fed. Supp. 970. Justice Sharpe quotes from the decision of the district court, which was reversed on appeal to the circuit court of appeals. 117 Fed. (2d) 310. On review by certiorari the supreme court of the United States reversed and remanded the case to the circuit court of appeals. *Columbia River Packers Ass'n, Inc.,* v. *Hinton*, 315 U. S. 143 (62 Sup. Ct. 520, 86 L. Ed. 750). Upon such remanding, the circuit court of appeals, in affirming the decision of the district court, said in part (131 Fed. [2d] 88):

"Was the Sherman act violated? Appellants, by their combination, *have acquired the power to fix the prices of fish and control the production thereof* which deprives consumers of the advantages which accrue to them from free competition in the market. That, we understand, is a violation of the Sherman act."

A careful reading of the above-cited decisions in the *Hinton Case* clearly indicates that the Sherman act was held to apply to the union's activities solely because the union sought to control the price and production of fish. Such decisions are readily distinguishable from the present case, in which there was no effort by the union or its affiliates to fix and control the price of funeral merchandise and services or to stifle competition through monopolistic control of such merchandise and services.

Plaintiffs cite and rely upon the case of *Hunt* v. *Riverside Co-operative Club,* 140 Mich. 538 (112 Am. St. Rep. 420), in which this court considered the application of a statute designed to prevent trusts, monopolies and price fixing (Act No. 255, § 1, Pub. Acts 1899 [see 3 Comp. Laws 1929, § 16647 (Stat. Ann. § 28.31)]). The membership of defendant Riverside Club was composed of master plumbers and wholesalers of plumbing supplies in the city of Detroit. The rules and regulations of the club provided for fixing the price of plumbing supplies, and that the wholesalers would sell only to master plumbers who were approved by the club, and that the plumbers would buy only from member wholesalers. The rules further provided that the master plumbers would not sell labor at prices below those fixed by the club. The decree of the trial court enjoined the activities of the defendants, as being in violation of the above-cited statute, and further enjoined them (p. 548) "from fixing and regulating, or attempting to fix and regulate, the price of labor employed in installing plumbing supplies." In affirming such decree with the modification eliminating the provision relative to fixing and regulating the price of labor, this court said in part, pp. 543, 544, 549:

"It is scarcely necessary to say that this agreement restricts, if it does not destroy, competition

between these members. The advantage that this arrangement gives the plumber members over the plumber nonmembers is obvious. * * * This arrangement was designed to create, and tends to create, a practical, though possibly incomplete, monopoly in favor of the plumber members. * * * *The manifest purpose of the two organizations, then, is to give to the master plumber members a monopoly of selling plumbers' supplies in the city of Detroit, and at the same time to restrict competition among themselves.* * * *

"In general, it may be said that the statute forbids certain contracts and certain defined trusts. An agreement fixing and regulating the price of labor is not one of these contracts, nor one of these trusts."

Such decision in the *Riverside Club Case* clearly recognizes the established rule, that statutes against restraint of trade and monopoly are aimed at the evil of combinations organized for the purpose and with the intent of fixing prices and stifling competition. In the present case there was no showing that defendants' activities were intended to or did result either in price fixing or in restriction of competition. Therefore, such activities were not in violation of our State statute hereinbefore quoted.

Plaintiffs contend that they were induced, by the fraud, coercion and compulsion of defendants, to sign the union contract in question. It appears that prior to 1942 the funeral directors had organized an association under the name of Affiliated Funeral Directors Association, and plaintiff Mulligan testified that "the only purpose for which the Affiliated was organized was to deal with this union problem." Plaintiffs were members of Affiliated, and Mulligan, who attended meetings of the association, said in substance that it was acting for plaintiffs as well as for all of the other funeral

homes which had joined.   It further appears that
the association, acting for plaintiffs and other mem-
bers, had negotiated a form of contract with de-
fendant union and had mailed copies of the pro-
posed contract to plaintiffs and other members, with
an accompanying letter stating in part:

"In accordance with the action taken at our an-
nual meeting (of the Affiliated Funeral Directors
Association) last night, one copy of the contract
which has been accepted by the union and approved
by our affiliation, is enclosed herewith.   *   *   *

"In addition to the above, one union 'application
for membership' card is enclosed.   *   *   *

"For your information, the contract has been
arbitrated by your executive committee for many
months, and the one we now have is distinctly more
advantageous to every funeral director than the
one originally proposed.   If you are unwilling to
sign this contract you have the right to deal indi-
vidually with the union, in which case the full initi-
ation fee will be required and the contract that will
be available to you will be much less desirable.
*   *   *

"If you do not sign the contract, please be helpful
and return it, stating your position."

Upon receiving the above letter, plaintiff Mulligan
signed the contract in behalf of the copartnership
and also the application for union membership, as
hereinbefore mentioned.   The record is convincing
that plaintiffs entered into the contract and became
affiliated with the union because they considered
such action to be for their best interest.   There
was no showing of fraud, coercion or compulsion on
the part of defendants that would justify voiding
such contract.   There was testimony regarding the
methods used to induce other companies to affiliate
with the union, but such companies are not ques-

tioning the validity of their contracts in the present proceedings.

It should be noted that the picketing was peaceful, that there was no strike or violence, and that the State statute relating to mediation of labor disputes (Act No. 176, Pub. Acts 1939 [Comp. Laws Supp. 1940, § 8628–1 *et seq.*, Stat. Ann. 1944 Cum. Supp. § 17.454 (1) *et seq.*]) is not involved. It should also be noted that no anti-injunction law similar to the Norris-LaGuardia act has been adopted, either by legislative enactment or judicial decision, in this State.

We have recognized that, under the constitutional guarantee of freedom of speech, a labor union may publicize the facts of a labor dispute by the process of peaceful picketing. *Book Tower Garage, Inc.,* v. *Local No. 415, International Union, U. A. W. A. (C. I. O.),* 295 Mich. 580; *People* v. *Bashaw,* 295 Mich. 503. Furthermore, it is not necessary that there be a dispute between an employer and his employees in order to entitle a union to picket peacefully as an exercise of such right of free speech. In *Bakery & Pastry Drivers & Helpers Local No. 802 of the International Brotherhood of Teamsters* v. *Wohl,* 315 U. S. 769 (62 Sup. Ct. 816, 86 L. Ed. 1178), the court said, p. 774:

"One need not be in a 'labor dispute' as defined by State law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive."

In *American Federation of Labor* v. *Swing,* 312 U. S. 321 (61 Sup. Ct. 568, 85 L. Ed. 855), there was no labor dispute or controversy between Swing and his employees, who were not union members. When the union, composed of those engaged in

beauty work, was unsuccessful in its attempt to unionize the workers in Swing's beauty parlor, it picketed his place of business. Swing and his employees began suit and obtained an injunction enjoining such picketing. In upholding the union's right to picket peacefully, the supreme court of the United States said, pp. 325, 326:

"All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing *en masse* or otherwise conducted' so as to occasion 'imminent and aggravated danger.' *Thornhill* v. *Alabama,* 310 U. S. 88, 105 (60 Sup. Ct. 736, 84 L. Ed. 1093). We are asked to sustain a decree which for purposes of this case asserts as the common law of a State that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him.

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a State has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular State regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the State. *A State cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209 (42

Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360). The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, *even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case.* 'Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 478 (57 Sup. Ct. 857, 81 L. Ed. 1229)."

See, also, *Cafeteria Employees Union, Local 302, v. Angelos,* 320 U. S. 293 (64 Sup. Ct. 126, 88 L. Ed. 58), which expressly reaffirms the principles enunciated in the *Swing Case.*

In the present case plaintiffs were competitors of and engaged in the same business and industry as members of defendant union and, under the decisions in the *Swing* and *Angelos Cases* cited above, it may reasonably be said that there was an "interdependence of economic interest." Plaintiffs' business was within the area of the industry within which the industrial controversy arose. In other words, the welfare and interests of union members might have been affected by the fact that plaintiffs, as competitors in the same industry, were not union members. Such interdependence of economic interest could exist although plaintiffs had no employees. *Cafeteria Employees Union, Local 302, v. Angelos, supra; Senn v. Tile Layers Protective Union,* 301 U. S. 468 (57 Sup. Ct. 857, 81 L. Ed. 1229).

In *People v. Lechner,* 307 Mich. 358, we said, "We are bound to follow the prevailing opinions of the

United States supreme court  *  *  *  in an interpretation of the provisions of the United States Constitution." (See, also, *Book Tower Garage, Inc.,* v. *Local No. 415, International Union, U. A. W. A. [C. I. O.], supra.*) Therefore, under the decisions of that court in the *Angelos, Swing* and *Senn Cases,* I am obliged to conclude that defendants, under their constitutional guarantee of freedom of speech, were entitled to picket plaintiffs' funeral home in a peaceful manner.

The object of defendant union was to induce plaintiffs to continue their union affiliation and membership. This was a lawful labor objective. See *Angelos, Swing* and *Senn Cases.* In addition to peaceful picketing, defendants called upon union members and concerns affiliated with the union to assist in accomplishing such objective, and requested them not to cross the picket line which had been established at plaintiffs' funeral home. Plaintiffs contend that such concerted activity by union members and affiliates was unlawful, as constituting a secondary boycott. In *Marvel Baking Co.* v. *Teamsters' Union Local No. 524,* 5 Wash. (2d) 346 (105 Pac. [2d] 46), the court quoted with approval from *Ellis* v. *Journeymen Barbers' International Union of America,* 194 Iowa, 1179, 1182 (191 N. W. 111, 32 A. L. R. 756), as follows (p. 358):

"The purpose of a *secondary boycott is to bring to bear a duress upon the customers of the person under attack,* by threatening them directly or indirectly with a boycott, if they persist in trading with such person."

See, also, *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443 (41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196); 31 Am. Jur. p. 957, § 252.

The courts have generally held secondary boycotts to be unlawful upon the broad principle that

customers of the boycotted firm are not parties to the industrial strife and, therefore, cannot, against their will, be made an ally of one of the parties, or upon the ground that such type of boycott constitutes unlawful coercion. See 31 Am. Jur. p. 959, § 258, and cases cited.

Defendants contend that the concerted action of union members and affiliates was lawful, as constituting only a primary boycott, which has been defined as follows:

"A boycott which is applied directly and alone to the offending person by withdrawing from him all business relations on the part of the organization that initiated the boycott." 31 Am. Jur. p. 957, § 251.

In the present case there was no showing of coercive action to compel plaintiffs' prospective customers to withhold their patronage. Members of defendant union and its affiliated companies had the legal right to refuse to deal with plaintiffs and others not affiliated with the union, and they could lawfully contract not to deal with them. In 31 Am. Jur. pp. 958, 964, §§ 256, 265, it is stated:

"The right of an individual to refuse to deal with another is not open to doubt. *According to the weight of authority, the fact that a member of a labor organization exercises this right in concert with his comembers does not render his otherwise lawful act unlawful, or make concerted action in this regard a wrongful conspiracy,* at least if such members are interested in bringing to a successful issue an industrial controversy between members of a labor organization and the person or manufacturer whose product, by a concerted action, such members have ceased to use. *The damage to the business of the persons subjected to such a primary boycott, lawfully conducted, is one of the incon-*

*veniences for which the law does not afford a remedy.   *   *   **

"The decisions are practically in harmony in holding that it is within the power of labor unions, and it is lawful for them, to instruct or order their members not to accept employment with an individual, or to continue in his employment, where the action of a union is justifiable in the sense that it is to promote the welfare of the members of the union. Similarly, it has been decided that a labor union may lawfully order its members not to work on premises where work is being done by employers who are deemed to be unfair to union labor."

In the case of *Lella v. Rubel Corporation*, 25 N. Y. Supp. (2d) 548, plaintiff coal peddlers sought to enjoin certain coal companies from refusing to deal with them. The coal companies, by contract with a union, had in effect agreed not to sell to concerns not affiliated with the union. In holding such contract valid, the court said:

"The union entertains the ambition of organizing completely the industry of coal handlers. It has the right to effect that total organization if it can. The coal companies are in the business of selling coal. Their product must be handled by workers. They had the right to enter into a contract with the union. To more firmly secure the performance of that agreement, the union stipulated in the contract that the company forego its right to carry on trade with persons driving their own trucks who buy coal for resale purposes. The company agreed to that restriction. That arrangement does not seem to differ from the situation where an employer contracts with a union to engage no nonunion workers. Its effect may keep certain men out of employment but its validity as a contract is unquestioned. It is the creation of the well known closed-shop. *Closing a shop to certain buyers is no different to closing it to certain workers.*"

In the case before us, defendant union was entitled to call upon its members and affiliates to assist in its controversy with plaintiffs, and their concerted action constituted, at most, only a primary boycott and was a legitimate means of accomplishing its lawful labor objective, that is, inducing plaintiffs to continue their union membership.

Plaintiffs cite and rely upon our decisions in *Lafayette Dramatic Productions, Inc.*, v. *Ferentz*, 305 Mich. 193 (145 A. L. R. 1158), and *Silkworth* v. *Local No. 575 of the American Federation of Labor*, 309 Mich. 746. In those cases the question of the union's right to picket as an exercise of the constitutional right of freedom of speech was not involved. In such cases we held only that the labor objectives which the defendants sought to accomplish were unlawful. The factual situations involved and the labor objectives sought in both the *Lafayette* and *Silkworth Cases* clearly distinguish them from the present case. The case of *Carpenters & Joiners Union of America, Local No. 213*, v. *Ritter's Cafe*, 315 U. S. 722 (62 Sup. Ct. 807, 86 L. Ed. 1143), and other authorities cited by plaintiffs do not sustain their contentions. In the *Ritter Case* the court held only that the State of Texas could confine the picketing to the "area of the industry" within which the labor dispute arose. In that case defendant Ritter was the owner of a cafe in the city of Houston, Texas. He entered into an agreement with a contractor to construct a building about a mile and a half away and wholly unconnected with the cafe. and its business. Because the building contractor employed nonunion labor, members of the carpenters' and painters' unions picketed Ritter's cafe. Union truck drivers refused to cross the picket line to deliver food and supplies, and trade-union members refused to patronize the cafe. The picketing was enjoined as constituting a violation of the State

anti-trust law (Texas penal code, art. 1632 *et seq.*). The supreme court of the United States sustained the injunction on the ground that the industrial conflict was between the contractor and the building workers' unions over the building construction, and that the Texas court had the right to localize such conflict by prohibiting interference with the cafe business, which was "wholly outside the economic context of the real dispute." In its majority opinion the court said in part, pp. 726–728:

"In the circumstances of the case before us, Texas has declared that its general welfare would not be served if, in a controversy between a contractor and building workers' unions, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder. The precise question is, therefore, whether the Fourteenth Amendment prohibits Texas from drawing this line *in confining the area of unrestricted industrial warfare.*

"Texas has undertaken to localize industrial conflict by prohibiting the exertion of concerted pressure directed at the business, wholly outside the economic context of the real dispute, of a person whose relation to the dispute arises from his business dealings with one of the disputants.   *   *   * Nor are we confronted here with a limitation upon speech in circumstances where there exists 'an interdependence of economic interest of all engaged in the same industry,' *American Federation of Labor v. Swing,* 312 U. S. 321, 326 (61 Sup. Ct. 568, 85 L. Ed. 855).   *   *   * The dispute concerns the labor conditions surrounding the construction of a building by a contractor. Texas has deemed it desirable to insulate from the dispute an establishment (Ritter's cafe) which industrially has no connection with the dispute.   *   *   *

"Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication.    *    *    *

"It is not for us to assess the wisdom of the policy underlying the law of Texas. Our duty is at an end when we find that the Fourteenth Amendment does not deny her the power to enact that policy into law."

In summary, defendants' purpose in the present case was to induce plaintiffs to continue their union affiliation and membership. This was a lawful labor objective. Peaceful picketing of the funeral home to accomplish such objective was a lawful exercise of the right of freedom of speech guaranteed by the Federal Constitution. See *Swing, Angelos, Senn* and other cases hereinbefore cited.

Under the facts and circumstances shown by the record, the concerted peaceful activity of the union, and its members and affiliated companies engaged in the same field of business as plaintiffs, was also a legitimate means of accomplishing such labor objective. There was no satisfactory showing of fraud, coercion or compulsion on the part of defendants in inducing plaintiffs to execute the union contract in question. The picketing was peaceful and there was no strike or violence. The record shows no unlawful activity on the part of defendants in their effort to induce plaintiffs to continue their union affiliation and membership.

The right of a union to picket peacefully for the purpose of inducing persons to join the union was upheld in the *Swing, Angelos, Senn,* and other cited cases, as a lawful exercise of the constitutional right of freedom of speech. There is no logical difference between the unions' efforts in those cases to induce new memberships, and defendant's effort in the

present case to induce plaintiffs to continue their union membership.

Plaintiffs were engaged in a business in which they were in competition with union members and affiliates. They were within the area of an industrial conflict which resulted in damage to their business. The mere fact that their business was damaged would not entitle them to the relief sought, in the absence of a showing of unlawful activity on the part of defendants.

The Michigan Funeral Directors & Embalmers Association had no contract with defendant union and made no showing entitling it to relief. Other questions presented do not require consideration.

The decree of the trial court dismissing plaintiffs' bill of complaint should be affirmed. Defendants should recover the costs of both courts.

BUSHNELL, J., concurred with STARR, C. J.