BETTY v BROOKS & PERKINS

Docket No. 96538. Argued April 5, 1994 (Calendar No. 5). Decided August 24, 1994.

Carnell Betty, brought an action under the Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, in the Wayne Circuit Court against Brooks & Perkins, her employer, claiming race and sex discrimination. The plaintiff, a black woman, alleged that a similarly situated white male employee with less qualifications and lower seniority was awarded a shift preference for which both had applied. The court, William Leo Cahalan, J., granted summary disposition for the defendant, finding that the case was preempted by § 301 of the federal Labor Management Relations Act, 29 USC 185(a). The Court of Appeals, JANSEN, P.J., and GRIFFIN, J. (MICHAEL J. KELLY, J., dissenting), reversed, finding that the question to be resolved was one of fact, regarding the motivation of the employer, and not one of law, regarding interpretation of a collective-bargaining agreement between the employer and the plaintiff's union (Docket No. 121952). The defendant appeals.

In an opinion by Justice GRIFFIN, joined by Chief Justice CAVANAGH, and Justices LEVIN, BRICKLEY, and MALLETT, the Supreme Court *held:*

The plaintiff's state law claim of race and sex discrimination in the workplace is independent of the collective-bargaining agreement between her union and her employer and, thus, is not preempted by federal law.

1. United States Supreme Court case law has held that § 301 of the Labor Management Relations Act expresses federal policy that federal courts should enforce collective-bargaining agreements on behalf of or against labor organizations by applying federal law. In general, a state-law claim alleging discrimination is not preempted by federal law if the claim is based on nonnegotiable state-law rights of employers and employees independent of any right established by a collective-bargaining agreement, or whether the claim is inextricably intertwined with consideration of the terms of the agreement. State law is preempted only if its application requires interpretation of a collective-bargaining agreement.

2. The essential elements of the state-law claim advanced by

the plaintiff are that similarly situated people have been treated differently because of their race or sex. The claim turns on a factual determination regarding the employer's conduct and motivation and can be resolved independent of the collective-bargaining agreement. The plaintiff is asserting non-negotiable state rights secured by the Michigan Civil Rights Act that apply to all employees, whether or not they belong to a union, and cannot be waived or conditioned on success at the bargaining table. Because the duty owed under the act by the employer to the plaintiff does not stem from the collective-bargaining agreement, her claim is independent for purposes of § 301 preemption, parallel protection under the terms of the agreement notwithstanding.

Justice RILEY, concurring, stated that the plaintiff's claim is not preempted under § 301.

The dispositive inquiry under state law is not what the collective-bargaining agreement provides but what the motivation of the defendant was. Moreover, merely because the defendant might claim in defense that its conduct was compelled by some implied fairness gleaned from the collective-bargaining agreement as a whole would not preempt the claim in this case. This would only help answer the factual question whether defendant was motivated by discrimination, but would not require the court to determine the legality of the decision under the collective-bargaining agreement. The defendant's burden is one of production only, rather than persuasion. After the plaintiff has set forth a prima facie case, Michigan courts place the burden of production on the defendant as a means of properly framing the dispositive issue, i.e., the motivation of the defendant, so that the plaintiff can then show that the purported defense was simply a pretext for discrimination.

Justice BOYLE, concurring in parts I and III of the majority opinion, stated that the defendant essentially conceded that the collective-bargaining agreement did not entitle the white male employee to retake the test.

Affirmed.

198 Mich App 28; 497 NW2d 512 (1993) affirmed.

*Rodrick K. Green* for the plaintiff.

*Blake, Kirchner, Symonds, MacFarlane, Larson & Smith, P.C.* (by *Christopher G. Manolis*), for the defendant.

Amicus Curiae:

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Theodore Sachs* and *Patricia J. Fabrizio*), for Michigan State AFL-CIO.

GRIFFIN, J. We must decide whether plaintiff's state-law claim of employer race and sex discrimination is preempted by § 301 of the federal Labor Management Relations Act (LMRA).[1] Because her action, based upon the Michigan Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.,* is independent, and resolution does not require interpretation of the collective-bargaining agreement between plaintiff's union and her employer, we conclude that the claim is not preempted by federal law.

I

Plaintiff Carnell Betty is a black female who began working for defendant Brooks & Perkins[2] as a welder in 1979. She and Brian Krawczyk, a white male who worked as a welder in the same department, were members of the United Auto Workers Union Local No. 157, and were covered by a collective-bargaining agreement.

As a quality control measure, pursued with approval of the union, defendant required a group of six welders, including plaintiff and Mr. Krawczyk, to attend classes for four weeks at Weld Tech Welding Education Center.[3] A letter of un-

---

[1] 29 USC 185(a).

[2] Brooks & Perkins was a division of AAR, Inc., an Illinois corporation.

[3] Weld Tech was then a subsidiary of the Chrysler Corporation.

derstanding,[4] signed by defendant and the union, provided that each of these employees was required to "successfully conclude [the course of] training to be considered as qualified to retain seniority within the Welder's Classification."

On March 14, 1983, Mr. Krawczyk completed a segment of the course and took a welding test. His instructor advised defendant that Mr. Krawczyk had passed. However, after he had completed the course and returned to work, defendant was notified by Weld Tech that the earlier report was an error and that Mr. Krawczyk had actually failed a portion of the examination. As a result, Mr. Krawczyk lost his seniority within the classification and was laid off.

In the meantime, plaintiff had also taken the welding course at Weld Tech and passed. At that

---

[4] Following is the full text of the letter of understanding:

This Agreement between the parties has been reached to address a special need for welders to satisfy customer schedules and is not intended to replace or modify the Memorandum of Understanding reached February 1, 1983.

Since the bulk of the present welding requirements are confined to one quarter inch thick, tee joint, Mig configuration, it is agreed Brooks & Perkins will recall and place into active employment those welders who are successful in passing the qualification test for that type joint. These employees will be considered as having a limited qualification. It is further understood that any other test successfully completed will qualify that individual to weld those specific type welds on Brooks & Perkins' products. .

It is agreed that all laid off welders have been offered the opportunity to attend "Weld Tech Welding Education Center" and as specified in the prior Agreement of February 1, 1983, must successfully conclude the training to be considered as qualified to retain seniority within the Welder's Classification.

Employees on the lay-off list may, at their option, waive the opportunity to accept recall into a limited qualification status, to continue training without affecting their seniority and upon successful completion of training, use their seniority to displace a junior employee.

point, she stood higher on the seniority list than Mr. Krawczyk.[5]

Mr. Krawczyk complained to the union, which in turn complained to defendant's management that if he had been timely informed of his failure, he could have retaken the test before completion of the course. Management determined that the treatment was unfair, and on April 12, 1983, Mr. Krawczyk was allowed to return to Weld Tech and retake the test. This time he passed and his seniority was reinstated.

Thereafter, on December 17, 1984, plaintiff and Mr. Krawczyk each applied for the same shift preference. According to defendant, the preference was awarded to Mr. Krawczyk in accordance with the collective-bargaining agreement because his seniority ranking was higher.[6] Plaintiff complained to the union, which refused to file a grievance.

Plaintiff then filed this discrimination suit, claiming that a similarly situated white male employee with less qualifications and lower seniority was awarded the shift preference. While the group required to take the Weld Tech course included both blacks and whites, plaintiff asserts that all of the whites passed the test except one, Brian Krawczyk, and that all of the blacks failed the test except one, plaintiff Carnell Betty. She further

[5] Article VIII of the collective-bargaining agreement provides that seniority of employees in the welders' classification is determined by date of entry. It is undisputed that Mr. Krawczyk had an earlier date of entry than plaintiff.

[6] Article VIII, § 6 of the collective-bargaining agreement provides:

Employees shall have shift preference by date-of-entry seniority within the classification. This right may be exercised once each six (6) month period. Shift preference will also be granted during the year to bump a probationary employee within the classification. All shift changes will be on Mondays if practicable.

contends that black employees who failed also retook the test and passed; however, they were placed at the bottom of the seniority list.

At the close of discovery, defendant moved for summary disposition pursuant to MCR 2.116(C)(4), (8), and (10), and argued, inter alia, that plaintiff's discrimination claim was preempted by § 301 of the LMRA.[7] The circuit court granted defendant's motion on the narrow ground of § 301 preemption and found it unnecessary to address the other issues.[8]

On appeal, a divided panel of the Court of Appeals reversed.[9] The panel majority opined that the "question to be resolved is a factual one regarding the motivation of defendant, and not the legal one of interpretation of the collective bargaining agreement," citing *Hall v Kelsey-Hayes Co,* 184 Mich App 277, 280; 457 NW2d 143 (1990). See also *Lingle v Norge Div of Magic Chef, Inc,*

[7] While removal jurisdiction based upon a federal question is determined by review of the complaint, 14A Wright, Miller & Cooper, Federal Practice & Procedure, § 3721, p 213 (and cases cited therein), federal courts will look beyond the pleadings in determining whether a state law claim is preempted by § 301. *United Steelworkers of America v Rawson,* 495 US 362; 110 S Ct 1904; 109 L Ed 2d 362 (1990); *Electrical Workers, AFL-CIO v Hechler,* 481 US 851, 861; 107 S Ct 2161; 95 L Ed 2d 791 (1987).

[8] In its opinion, the trial court stated in part:

Defendant first maintains that the instant Elliott-Larsen claim for deprivation of civil rights is pre-empted by federal law, to wit § 301 . . . ; secondly defendant submits that there is no genuine issue of material fact and it is entitled to judgment as a matter of law, MCR 2.116(C)(10).

Inasmuch as the pre-emption issue is potentially dispositive of the entire case, the Court examines it first.

* * *

[T]he Court finds that [plaintiff's claim is] pre-empted by Federal Labor Law. Defendant's motion shall be granted. It is unnecessary to discuss Defendant's remaining issue.

[9] 198 Mich App 28, 30; 497 NW2d 512 (1993).

486 US 399, 419; 108 S Ct 1877; 100 L Ed 2d 410 (1988).

We then granted defendant's application for leave to appeal. 444 Mich 914 (1994).

II

The authority of Congress to preempt state law is rooted in the Supremacy Clause of the United States Constitution.[10] *Gibbons v Ogden,* 22 US (9 Wheat) 1; 6 L Ed 23 (1824). Whether a state claim is preempted by a federal statute "is, of course, a question of federal law." *Allis-Chalmers Corp v Lueck,* 471 US 202, 214; 105 S Ct 1904; 85 L Ed 2d 206 (1985). "[W]here Federal questions are involved we are bound to follow the prevailing opinions of the United States supreme court." *Harper v Brennan,* 311 Mich 489, 493; 18 NW2d 905 (1945).

A

Section 301 of the LMRA provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. [29 USC 185(a).]

---

[10] Article VI, § 2 of the United States Constitution provides in part:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

In *Textile Workers v Lincoln Mills,* 353 US 448, 455; 77 S Ct 912; 1 L Ed 2d 972 (1957), the United States Supreme Court concluded that § 301 "does more than confer jurisdiction in the federal courts over labor organizations." From the legislative history of § 301, the Court gleaned an expression of "federal policy that federal courts should enforce [collective-bargaining] agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way." *Id.* With this Congressional objective in mind, the Court concluded that "the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws." *Id.* at 456.

The import of *Lincoln Mills* was demonstrated when the Court first addressed the preemptive effect of § 301 in *Local 174, Teamsters v Lucas Flour Co,* 369 US 95; 82 S Ct 571; 7 L Ed 2d 593 (1962). At issue was whether a suit in state court seeking "damages for business losses caused by [a union] strike" could be decided by the application of state contract law. *Id.* at 97. Because resolution of the dispute turned on the question whether the strike breached the collective-bargaining agreement, the Court held that "incompatible doctrines of local law must give way to principles of federal labor law." *Id.* at 102. In broad terms, the Court declared:

> The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute. Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of *Lincoln Mills,* requiring issues raised in suits of a kind covered by § 301 to be decided according to the precepts of federal labor policy.

More important, the subject matter of § 301(a)
"is peculiarly one that calls for uniform law." [*Id.*
at 103.]

While *Lucas Flour* made clear that a state ac-
tion that alleges breach of a collective-bargaining
agreement is preempted by § 301,[11] the Court's
subsequent task of delineating the extent to which
§ 301 displaces state-law claims when breach of a
collective-bargaining agreement is not specifically
alleged has proved to be more difficult.

In *Allis-Chalmers Corp v Lueck, supra* at 210,
the Court observed that "[i]f the policies that
animate § 301 are to be given their proper
range, . . . the pre-emptive effect of § 301 must
extend beyond suits alleging contract violations."
While acknowledging that some tort actions must
be preempted to achieve the desired uniformity in
the interpretation of labor contracts,[12] the Court

[11] The *Lucas Flour* Court reasoned:

The possibility that individual contract terms might have
different meanings under state and federal law would inevita-
bly exert a disruptive influence upon both the negotiation and
administration of collective agreements. [*Id.* at 103.]

See also *Avco Corp v Aero Lodge No 735,* 390 US 557, 560; 88 S Ct
1235; 20 L Ed 2d 126 (1968) (where the plaintiff sought enforcement of
a no-strike clause of a collective-bargaining agreement in a state
court action, the Supreme Court affirmed the removal of the action to
federal district court and noted that "[a]n action arising under § 301
is controlled by federal substantive law even though it is brought in a
state court").

[12] The Court explained that, in order to truly facilitate "interpretive
uniformity and predictability" in collective-bargaining agreements,

questions relating to what the parties . . . agreed, and what
legal consequences were intended to flow from breaches of that
agreement, must be resolved by reference to uniform federal
law, whether such questions arise in the context of a suit for
breach of contract or in a suit alleging liability in tort. Any
other result would elevate form over substance and allow
parties to evade the requirements of § 301 by relabeling their
contract claims as claims for tortious breach of contract. [*Id.* at
211.]

took pains to explain that the reach of § 301 preemption has limits:

> In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent . . . to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.
> Therefore, state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are pre-empted by those agreements. [*Id.* at 212-213.]

In resolving the case then before it, the *Lueck* Court articulated this standard:

> Our analysis must focus . . . on whether the [state] tort action . . . confers *nonnegotiable* state-law rights on employers or employees *independent* of any right established by contract, or, instead, whether evaluation of the tort claim is *inextricably intertwined* with consideration of the terms of the labor contract. If the state tort law purports to define the meaning of the contract relationship, that law is pre-empted. [*Id.* at 213. Emphasis added.][13]

In *Lingle v Norge Div of Magic Chef, Inc, supra* at 413, the Supreme Court again emphasized the limits of § 301 preemption. In a unanimous decision, the Court ruled that "application of state law is pre-empted by § 301 . . . only if such application requires the interpretation of a collective-bargaining agreement." The Court observed that

---

[13] See also *Caterpillar, Inc v Williams,* 482 US 386, 394; 107 S Ct 2425; 96 L Ed 2d 318 (1987) ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement' ").

the plaintiff's retaliatory discharge claim under
Illinois law required a factual determination re-
garding "the conduct of the employee and the
conduct and motivation of the employer." *Id.* at
407. Because "this purely factual inquiry . . . does
not turn on the meaning of any provision of a
collective-bargaining agreement," the Court con-
cluded:

> [T]he state-law remedy in this case is "indepen-
> dent" of the collective-bargaining agreement in the
> sense of "independent" that matters for § 301 pre-
> emption purposes: resolution of the state-law claim
> does not require construing the collective-bargain-
> ing agreement. [*Id.* at 407.]

It has been suggested that development of the
scope of preemption under § 301 has been driven,
in part, by an effort to make certain that " 'parties
[are not allowed] to evade the requirements of
§ 301 by relabeling their contract claims as claims
for tortious breach of contract.' " *United Steel-
workers of America v Rawson,* 495 US 362, 369;
110 S Ct 1904; 109 L Ed 2d 362 (1990) (quoting
*Lueck, supra* at 211).[14]

Guided by these general principles and parame-
ters, we turn now to an analysis of the issue
before us—whether resolution of plaintiff's state
civil rights claim requires interpretation of the
collective-bargaining agreement.

B

We begin by focusing on the essential elements
of the state-law claim advanced by plaintiff. She
complains that a similarly situated, nonblack male

---

[14] See also Van Wezel Stone, *The legacy of industrial pluralism:
The tension between individual employment rights and the New Deal
collective bargaining system,* 59 U Chi L R 575, 594 (1992).

employee with less qualifications and lower seniority received special treatment by defendant during the testing process, in violation of her rights protected by the Michigan Civil Rights Act.[15] In order to establish a prima facie case of "[d]isparate treatment" race discrimination, a plaintiff "must show that [she] was a member of the class entitled to protection under the act and that, for the same or similar conduct, [she] was treated differently than one who was a member of a different race." *Schipani v Ford Motor Co,* 102 Mich App 606, 617; 302 NW2d 307 (1981) (citing *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 [1971]). Likewise, "the essence of a sex discrimination civil rights suit is that similarly situated people have been treated differently because of their sex." *Radtke v Everett,* 442 Mich 368, 379; 501 NW2d 155 (1993). See also *Marsh v Dep't of Civil Service (After Remand),* 173 Mich App 72; 433 NW2d 820 (1988).

Plaintiff argues that resolution of her state discrimination claim turns on a factual determination regarding defendant's conduct and motivation in allowing Mr. Krawczyk to retake the welding test and in reinstating his seniority. Contending that her claim can be resolved without interpreting the collective-bargaining agreement, plaintiff posits that it is "independent" of the agreement and not preempted by § 301. We agree.

Highly instructive is a statement by the *Lingle* Court that acknowledges the unique character of a state discrimination claim:

---

[15] MCL 37.2202; MSA 3.548(202) provides, in pertinent part:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire, or recruit, discharge, or otherwise discriminate against an individual with respect to employment . . . because of religion, race, color, national origin, age, sex, height, weight, or marital status.

In the typical case a state tribunal could resolve either a *discriminatory* or retaliatory discharge claim without interpreting the "just cause" language of a collective-bargaining agreement. [*Lingle,* 486 US 413. Emphasis added.]

Implicit is the recognition that claims under state statutes prohibiting discrimination often turn on issues of fact pertaining to the conduct or motive of the defendant, rather than on the interpretation of a collective-bargaining agreement. That is the case here.

It is undisputed that Mr. Krawczyk had an earlier date of entry than plaintiff, and therefore more seniority within the welder's classification at the point when the Weld Tech course began on February 28, 1983. The parties have registered no disagreement concerning the terms or meaning of the collective-bargaining agreement as it relates to seniority, shift preference, or lay off. Although defendant seeks to emphasize that Mr. Krawczyk was awarded the shift preference because of a higher seniority ranking, the critical issue is whether the decisions to allow Mr. Krawczyk to retake the test and then to reinstate his seniority were based on racial or gender considerations.

Plaintiff's argument that her claim is independent of the collective-bargaining agreement is strongly buttressed by the fact that she is asserting nonnegotiable state rights—secured by the Michigan Civil Rights Act. These are rights that apply to all employees, whether or not they belong to a union. Such rights cannot be waived or conditioned on success at the bargaining table.

While acknowledging that this factor alone may not establish the independence of a state claim, the *Lingle* Court took note of the fact that "most state laws that are not pre-empted by § 301 will

grant nonnegotiable rights that are shared by all state workers . . . ." *Id.* at 408, n 7.

The jurisprudence of the United States Court of Appeals for the Sixth Circuit is in accord. In *Smolarek v Chrysler Corp,* 879 F2d 1326 (CA 6, 1989) (en banc), cert den *Chrysler Corp v Smolarek,* 493 US 992 (1989), an eight-judge majority ruled that the particular claims presented under Michigan's Handicappers' Civil Rights Act (HCRA), MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.,* were not preempted by § 301. *Id.* at 1335. Seven judges dissented in part. Speaking through Judge Kennedy, they reasoned that because no right of accommodation is conferred upon a handicapped employee by the HCRA, the accommodation sought by the plaintiffs in *Smolarek* was negotiable, and that to that extent such a claim is preempted by § 301. However, even the dissenting judges recognized that interpretation of a collective-bargaining agreement is not required in the typical case alleging race, sex, or age discrimination. Judge Kennedy explained:

> In race, sex, and age cases, interpretation of the collective bargaining contract is unnecessary. . . . The right to be free of race, sex, or age discrimination is independent of any ancillary right contained in a collective bargaining agreement.
>
> Likewise, if an employee is terminated for a handicap unrelated to his ability to perform the functions of his job, interpretation of a collective bargaining agreement is unnecessary to his claim. The HCRA has provided a nonnegotiable right to be free of this type of discrimination. [*Id.* at 1338 (Kennedy, J., dissenting in part).][16]

---

[16] Judge Kennedy agreed with the *Smolarek* majority regarding the appropriate standard for determining § 301 preemption. However, she disagreed with the majority's application of the standard to the plaintiffs' HCRA claims. Noting that Michigan's HCRA prohibits discrimination only with respect to "a handicap that is unrelated to the

Relying on *Lingle* and *Smolarek, supra,* the United States Court of Appeals for the Sixth Circuit later held in *O'Shea v Detroit News,* 887 F2d 683 (CA 6, 1989), that a plaintiff's HCRA discrimination claim was not preempted by § 301. Recognizing the nonnegotiability of certain rights under the HCRA, the court explained:

> Michigan employees have the right not to be discriminated against on the basis of age or handicap without regard to the collective bargaining agreement's language about an employee's rights. [*Id.* at 687.][17]

Other federal courts have embraced the notion that state antidiscrimination statutes confer nonnegotiable rights that are independent of any collective-bargaining agreement. In particular, the United States Court of Appeals for the Ninth Circuit, relying on *Lingle,* has ruled generally that state discrimination claims, whether based on age, race, handicap, religion, or national origin, are *not* preempted by § 301. See, e.g., *Ramirez v Fox Television Station, Inc,* 998 F2d 743 (CA 9, 1993).[18]

---

individual's ability to perform the duties of a particular job or position," MCL 37.1202(1)(a); MSA 3.550(202)(1)(a), see *Carr v General Motors Corp,* 425 Mich 313; 389 NW2d 686 (1986), Judge Kennedy concluded that "the HCRA confers no right of accommodation," and accommodation is therefore "a negotiable right provided either by . . . the collective bargaining agreement, or voluntarily." *Id.* at 1338.

[17] See also *Gavie v Stroh Brewery Co,* 668 F Supp 608 (ED Mich, 1987), aff'd 877 F2d 62 (CA 6, 1989) (§ 301 does not preempt an age discrimination claim because such a claim invokes a state statute that confers rights that are independent of any right established by contract).

[18] See also *Cook v Lindsay Olive Growers,* 911 F2d 233 (CA 9, 1990) (a religious discrimination suit was not preempted); *Jackson v Southern California Gas Co,* 881 F2d 638 (CA 9, 1989) (a racial discrimination suit was not preempted); *Chmiel v Beverly Wilshire Hotel Co,* 873 F2d 1283 (CA 9, 1989) (an age discrimination suit was not preempted); *Ackerman v Western Electric Co,* 860 F2d 1514 (CA 9, 1988) (a handicap discrimination suit was not preempted).

In *Ramirez,* the court reasoned that a suit charging discrimination on the basis of national origin was not preempted by § 301 because the plaintiff asserted rights under the California Employment Act that are " 'nonnegotiable' " and " 'cannot be removed by private contract.' " *Id.* at 748, quoting *Cook v Lindsay Olive Growers,* 911 F2d 233, 240 (CA 9, 1990). The *Ramirez* defendant also argued that the plaintiff's claim would require "reference" to the collective-bargaining agreement. However, the court rejected any suggestion that mere "reference" to a collective-bargaining agreement is the equivalent of "interpretation" of the agreement. *Id.*

In *Rawson, supra,* the United States Supreme Court focused on a different ground worthy of consideration in the § 301 analysis: the origin of the legal duty allegedly breached by the defendant. In that case, ninety-one miners were killed in an underground fire. Survivors of four deceased miners sued the United Steelworkers of America, claiming that the decedents' deaths were caused by negligent acts of the union. They alleged that the

> members of the safety committee designated by the Union had been inadequately trained on mine safety issues . . . [and] had negligently performed inspections of the mine that it had promised to conduct, failing to uncover obvious and discoverable deficiencies. [*Id.* at 365.]

The *Rawson* Court ruled that the state-law negligence claim was preempted by § 301 because the duty owed to the miners did not exist independent of the collective-bargaining agreement. The Court explained:

> This is not a situation where the Union's dele-

gates are accused of acting in a way that might violate the duty of reasonable care owed to every person in society. [*Id.* at 371.][19]

We believe that this reasoning in *Rawson* reinforces plaintiff's argument in the instant case that her state civil rights claim is not dependent on the collective-bargaining agreement. Unlike the duty in *Rawson,* which was owed only to union members by virtue of the terms of a collective-bargaining agreement, the duty of this defendant to refrain from discriminating on the basis of race or gender is owed under the Michigan Civil Rights Act to *every* current and prospective employee, regardless of union status. Because the duty owed in this case does not stem from the collective-bargaining agreement, we find merit in plaintiff's contention that her claim is independent for purposes of § 301 preemption.[20]

On the other hand, defendant argues that resolution of plaintiff's claim requires interpretation

[19] See also *Electrical Workers v Hechler,* n 7 *supra* (the plaintiff's claim that the union negligently failed to provide a safe workplace was held completely preempted because the union's duty of care arose under the collective-bargaining agreement).

[20] Our determination that plaintiff's state civil rights claim is independent of the collective-bargaining agreement is consistent with the United States Supreme Court's view of similar rights protected by title VII of the Civil Rights Act, 42 USC 2000e *et seq.* In *Alexander v Gardner-Denver Co,* 415 US 36, 48-49; 94 S Ct 1011; 39 L Ed 2d 147 (1974), a unanimous Court, speaking through Justice Powell, ruled that a discharged employee could pursue a title VII action in federal court, despite the fact that he had previously submitted his claim to arbitration pursuant to a nondiscrimination clause in a collective-bargaining agreement. The Court explained:

[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.

of the collective-bargaining agreement.[21] We disagree. First, it is clear that Mr. Krawczyk was allowed by defendant to be retested to regain his seniority out of a perceived notion of fairness rather than reliance upon any provision of the collective-bargaining agreement.[22] Indeed, the agreement and the letter of understanding are completely silent with respect to the treatment to be accorded an employee in Mr. Krawczyk's situation.

That defendant's conduct and motivation were not based on the agreement or letter of understanding was conceded by defendant's counsel at oral argument. In response to a question posed by Justice BOYLE, defendant's counsel stated that the decision to allow Mr. Krawczyk to be retested was based solely on a notion of fairness, that no provision in the letter of understanding referred to a welder's right to retake an unsuccessful test because such a situation was unanticipated.

Moreover, even if we were to agree with defendant that portions of the collective-bargaining agreement, including the seniority provision, were relevant in determining the conduct and motives of defendant, this alone would not transform plaintiff's claim into a federal contract dispute

[21] Defendant also contends that federal courts have exclusive jurisdiction over labor contract disputes that arise under § 301 of the LMRA. However, this question was settled in *Dowd Box Co v Courtney*, 368 US 502; 82 S Ct 519; 7 L Ed 2d 483 (1962), wherein the United States Supreme Court determined that, while federal law is applicable, state and federal courts have concurrent jurisdiction with respect to contract disputes within the ambit of § 301.

[22] In an affidavit, Mr. Howat, defendant's personnel manager, stated that he was approached by a union representative who complained that the school had "unreasonably and unfairly" delayed in processing the testing of Mr. Krawczyk. "It was agreed that he should not be punished for an oversight by Weld Tech," and that he "would be allowed to re-take the test . . . and upon passing, he would be recalled from layoff and his seniority would be restored."

within the ambit of § 301.[23] The Supreme Court cautioned in *Lueck* that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 . . . ." *Id.* at 211. The Court further explained in *Lingle, supra* at 409-410:

> [E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.[24]

---

[23] Similarly, in *Hall v Kelsey-Hayes Co, supra,* the plaintiff, a black male, alleged that he and other black employees were denied wait-listing for apprenticeships, while white employees secured positions on the waiting list and were ultimately placed in an apprenticeship program. On the basis of a review of the plaintiff's complaint in *Hall,* the panel unanimously agreed that the complaint did not assert denial of rights under the collective-bargaining agreement; rather, he claimed that the defendant treated him disparately compared to similarly situated white employees. Thus, the panel opined that the focus of its inquiry was whether the plaintiff was treated in a disparate manner, motivated by racial discrimination without regard to the terms of the collective-bargaining agreement.

The *Hall* panel reasoned:

> State law discrimination claims which assert denial of rights under a collective bargaining contract necessarily require the interpretation of the contract, and so are preempted by § 301. . . . However, where the plaintiff alleges discriminatory disparate treatment *and* the defendant claims that plaintiff's treatment was in accordance with the terms of the collective bargaining contract, there is no federal preemption of plaintiff's discrimination claims. [*Id.* at 280-281.]

[24] See also *Smolarek, supra* at 1334, in which the court concluded that the plaintiff's handicap discrimination claim was not preempted despite the fact that "Chrysler is likely to assert as its defense to [the plaintiff's] claim that it based its actions on the provisions of the labor agreement regarding reinstatement and accommodation." The court reasoned:

> In order to resolve the HCRA claim in light of this defense, a court need only decide whether Chrysler took actions adverse to [the plaintiff] because of his handicap or rather solely

Finally, although in this case the collective-bargaining agreement includes a provision designed to protect employees from race and gender discrimination,[25] this fact alone does not render plaintiff's state law claim "dependent" on the collective-bargaining agreement. As the Supreme Court observed in *Lingle, supra* at 412-413:

> [T]he mere fact that a broad contractual protection against discriminatory—or retaliatory—discharge may provide a remedy for conduct that coincidentally violates state law does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract.

Consequently, "[p]arallel protection under the terms of the contract and under state discrimination law does not mean that the contract must be interpreted to resolve the state law claim."[26] Like the United States Supreme Court, we decline to rule that § 301 preempts plaintiff's state discrimination claim merely because the employer has

because Chrysler felt bound by the union agreement to take the actions or for some other legitimate reason. It is not necessary to decide at the outset whether or not Chrysler's interpretation of the agreement is correct as a matter of federal labor law. The question is a factual one: What was Chrysler's motivation? [*Id.*]

[25] Article III-A, ¶ 3, of the collective-bargaining agreement provides in part:

The provisions of this Agreement shall apply to all employees covered by this Agreement without discrimination on account of race, color, religion, age, sex, marital status, handicap, national origin, creed or political affiliation . . . . In addition, the Company intends fully to comply with applicable state and federal statutes, relating to non-discrimination on account of race, color, religion, age, sex, marital status, national origin, creed, political affiliation or handicap.

[26] White, *Section 301's preemption of state law claims: A model for analysis,* 41 Ala L R 377, 428 (1990).

agreed to comply with the statutory mandates of Michigan labor law.

### III

In conclusion, plaintiff asserts a claim against her employer under the Michigan Civil Rights Act for damages as a result of an alleged violation of her nonnegotiable state right to be free from racial and gender-based discrimination in the workplace. We find that this right is independent of the collective-bargaining agreement, i.e., the resolution of her claim does not require an interpretation of the collective-bargaining agreement. We hold, therefore, that because plaintiff's discrimination claim is independent of the agreement, her claim is not preempted by § 301 of the LMRA.[27]

We affirm the decision of the Court of Appeals and remand the case to the trial court for further proceedings consistent with this opinion.[28]

CAVANAGH, C.J., and LEVIN, BRICKLEY, and MALLETT, JJ., concurred with GRIFFIN, J.

RILEY, J. (*concurring*). In the instant case, plaintiff, a black female, asserts a racial and sexual discrimination claim under § 202 of the Michigan Civil Rights Act, MCL 37.2202; MSA 3.548(202). In essence, plaintiff claims that she should have been given a shift preference over Brian Krawczyk, a white male employee who, because he failed a

---

[27] Amicus curiae Michigan State AFL-CIO argues that our decision today should apply "only to state law discrimination claims brought against employers and not to such claims brought against labor organizations." See *Maynard v Revere Copper Products, Inc,* 773 F2d 733 (CA 6, 1985). We neither decide nor intimate whether a similar claim brought by plaintiff against her union would be preempted.

[28] Although we conclude that plaintiff's claim is not preempted by § 301 of the LMRA, we neither decide nor intimate any view with respect to other grounds advanced in the motion for summary disposition, i.e., MCR 2.116(C)(8) and (10).

welding test, should have lost his seniority, thereby giving plaintiff more seniority. However, defendant allowed Mr. Krawczyk to retake the test, which he later passed, and retain his seniority to the detriment of plaintiff. Accordingly, plaintiff brings this suit maintaining that defendant was motivated by discriminatory purposes, i.e., other black female employees failed the test, later retook the test and passed, yet still lost their seniority, whereas a white male who did the same was allowed to retain his seniority.

Defendant defends in part on the basis that this state-law claim is preempted by § 301 of the federal Labor Management Relations Act of 1947.[1] Essentially, defendant contends that resolution of the instant claim requires interpretation of the collective-bargaining agreement and thus preempts this claim. See *Lingle v Norge Div of Magic Chef, Inc,* 486 US 399; 108 S Ct 1877; 100 L Ed 2d 410 (1988). I disagree and accordingly join the majority's finding of no preemption.

At the outset, I note that the development of United States Supreme Court precedent in this area has at times seemed contradictory. Indeed, before 1987, the Court seemed to resolve the question whether a state-law claim is independent of the collective-bargaining agreement for purposes of preemption by asking "whether evaluation of the [state-law] claim is inextricably intertwined with" or "substantially dependent" on the terms of the collective-bargaining agreement. *Allis-Chalmers Corp v Lueck,* 471 US 202, 213, 220; 105 S Ct 1904; 85 L Ed 2d 206 (1985). However, as demonstrated in *Lingle,* the Supreme Court seemed to have narrowed the gates of preemption by changing the focus to whether resolution of the state-law claim requires interpreting or construing

[1] 29 USC 185(a).

the collective-bargaining agreement.[2] *Lingle, supra* at 407.

Nonetheless, while the test has undergone some refinement, the general approach to making this inquiry has not. In *Lueck, Lingle* and, most recently, *United Steelworkers of America v Rawson,* 495 US 362; 110 S Ct 1904; 109 L Ed 2d 362 (1990), the Court found dispositive its analysis whether a prima facie case under state law requires a court to construe the collective-bargaining agreement, i.e., whether the elements of the underlying state-law claim necessitate construing the agreement. See *Lueck, supra* at 216-218; *Lingle, supra* at 406-407.

In *Lueck,* the Court considered the Wisconsin tort of bad-faith handling of an insurance claim. The Court determined that Wisconsin law

> intrinsically relates to the nature and existence of the contract. *Hilker v Western Automobile Ins Co,* 204 Wis 1, 13-16; 235 NW 413, 414-415 (1931). Thus the tort exists for breach of a "duty devolv[ed] upon the insurer by reasonable implication from the express terms of the contract," the scope of which, crucially, is "ascertained from a consideration of the contract itself." [*Id.* at 216.]

Moreover, the Court buttressed its conclusion by noting that under Wisconsin law "the tort duty was derived from the implied covenant of good faith and fair dealing found in every contract." *Id.* at 217.

---

[2] On remand from the United States Supreme Court for consideration in light of *Lingle,* the Supreme Court of Alabama noted:

> It appears that the *Lingle* Court shifted its analysis from the "inextricably intertwined" test to the "interpreting the agreement" test and thereby restricted the application of preemption. [*Reynolds Metals Co v Mays,* 547 So 2d 518, 522 (Ala, 1989).]

Similarly, in *Rawson,* the plaintiffs—survivors of four deceased miners—brought a state-law suit against the union for negligently inspecting a mine where plaintiffs' decedents worked. In finding the claim preempted, the Court noted that "the Union's representatives were participating in the inspection process pursuant to the provisions of the collective-bargaining agreement" and under state law "the agreement determined the nature and scope of the Union's duty. If the Union failed to perform a duty in connection with inspection, it was a duty arising out of the collective-bargaining agreement signed by the Union as the bargaining agent for the miners." *Id.* at 371. Indeed, the Court noted that this duty owed to these deceased workers was separate and distinct from "a situation where the Union's delegates are accused of acting in a way that might violate the duty of reasonable care owed to every person in society." *Id.* In light of this basis in state law, the Court found the claim preempted.

On the other hand, in *Lingle,* the Court found that the Illinois tort of retaliatory discharge for filing a worker's compensation claim does not require interpreting the collective-bargaining agreement. In examining the elements of the tort, the Court noted that plaintiff must show "(1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights." Accordingly, to maintain this suit, plaintiff did not have to rely on any provision of the collective-bargaining agreement, express or implied. "Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer." *Id.* at 407. Indeed, the Court held that

any possible defense, i.e., having a nonretaliatory reason for the discharge, would likewise not require construing any provision of the agreement because this also is merely a factual inquiry with regard to defendant's motivation.[3]

In the instant case, plaintiff's racial and sexual discrimination claim is strikingly similar to the tort in *Lingle.* To establish unlawful racial and sexual discrimination, plaintiff would have to prove by a preponderance of the evidence that discrimination exists either by disparate treatment or intentional discrimination. See *Ruppal v Treasury Dep't,* 163 Mich App 219, 226; 413 NW2d 751 (1987). To do so, plaintiff must prove that

> she was a member of a class entitled to protection under the statute and that, for the same or similar conduct, she was treated differently than a man [for sexual discrimination or a nonblack employee for racial discrimination]. The crux of a sex[ual or racial] discrimination action is that similarly situated persons have been accorded different treatment because of their sex [or race]. [*Slayton v Michigan Host, Inc,* 144 Mich App 535, 541; 376 NW2d 664 (1985) (citations omitted); *Jenkins v Southeastern Michigan Chapter, American Red Cross,* 141 Mich App 785, 793-795; 369 NW2d 223 (1985).]

If plaintiff meets this burden, she has set forth a prima facie case of unlawful discrimination. Thus, the burden of production[4] then shifts to the

defendant to articulate a legitimate, nondiscrimi-

---

[3] In contrast, the factual inquiry in *Lueck,* as mandated by state law, required a finding of preemption because the factual inquiry necessarily focused on the terms of the agreement. In *Lingle,* however, the factual inquiry only focused on defendant's motivation.

[4] In 1 Larson, Employment Discrimination (2d ed), § 8.03[1], p 8-50, Professor Larson describes this not as a burden of persuasion, "but rather one of production of admissible evidence." Indeed, in *Texas Dep't of Community Affairs v Burdine,* 450 US 248, 254-255; 101 S Ct 1089; 67 L Ed 2d 207 (1981), the United States Supreme Court stated:

natory reason for its actions. If the defendant is
able to articulate such a reason, the plaintiff must
then be given the opportunity to prove by a pre-
ponderance of the evidence that the reasons of-
fered by the defendant were not its true reasons
but were mere pretext for the discrimination.
[*Slayton, supra* at 541-542. Citation omitted.]

In reviewing these elements, it is clear that the
court will not have to interpret any express or
implied provision of the collective-bargaining
agreement. Unlike both *Lueck* and *Rawson, supra,*
the dispositive inquiry under state law is not what
the collective-bargaining agreement provides, but,
as in *Lingle,* what was the motivation of defen-
dant, i.e., discrimination or no discrimination.
Moreover, as in *Lingle,* merely because defendant
might claim in defense that its conduct was com-
pelled by some implied fairness gleaned from the
collective-bargaining agreement as a whole would
not make the instant claim preempted. This would
only help answer the factual question whether
defendant was motivated by discrimination,[5] but
would not require the court to determine the

The defendant need not persuade the court that it was
actually motivated by the proffered reasons. . . . It is sufficient
if the defendant's evidence raises a genuine issue of fact as to
whether it discriminated against the plaintiff. To accomplish
this, the defendant must clearly set forth, through the introduc-
tion of admissible evidence, the reasons for the plaintiff's
rejection.

[5] At oral argument defendant could not indicate what particular
provisions of the collective-bargaining agreement require interpreta-
tion in resolving this discrimination suit. Indeed, defense counsel
conceded that nothing in the letter of understanding or the collective-
bargaining agreement addressed whether Mr. Krawczyk should be
permitted to retake the test. Moreover, defendant agrees that the
letter of understanding and other provisions in the collective-bargain-
ing agreement are plain and unambiguous. Thus, defendant's only
argument linking this decision to the letter of understanding or the
collective-bargaining agreement is some measure of fairness stem-

legality of the decision under the collective-bargaining agreement.[6]

---

ming from the fact that Mr. Krawczyk was initially informed that he had passed, but after further destructive testing on the welds, was later determined to have failed. Admittedly, resolution of this issue would require interpreting the agreement since defendant is essentially contending that the agreement created some implied right to this conduct. See *Lueck, supra* at 215. However, as indicated above, the court need not decide this issue as a matter of law because the focus of this suit is simply the factual inquiry whether defendant harbored an illicit or discriminatory motive to the detriment of plaintiff.

If, however, this claim had implicated the terms of the collective-bargaining agreement as in both *Lueck* and *Rawson,* we would be without authority to simply conclude that neither the express nor the implied provisions of the contract provide for such conduct. If we did, we would be doing what we set out not to do, i.e., interpret the contract:

> The assumption that the labor contract creates no implied rights is not one that state law may make. Rather, it is a question of federal contract interpretation whether there was an obligation under this labor contract to provide the payments in a timely manner, and, if so, whether Allis-Chalmers' conduct breached that implied contract provision. [*Lueck, supra* at 215.]

In my view, the majority comes dangerously close to violating this principle when noting that "the agreement and the letter of understanding are completely silent with respect to the treatment to be accorded an employee in Mr. Krawczyk's situation." *Ante* at 287.

[6] "It is *not* necessary to decide at the outset whether or not [the defendant's] interpretation of the agreement is correct as a matter of federal labor law." *Smolarek v Chrysler Corp,* 879 F2d 1326, 1334 (CA 6, 1989). Indeed, in *O'Shea v Detroit News,* 887 F2d 683, 687 (CA 6, 1989), the court made the following observation:

> [T]he question of whether or not the plaintiff was discriminated against was separate from any possible defense the employer might have under the contract. All the plaintiff has to allege is that an action was taken against him because of a motive impermissible under the Act. It is irrelevant to the preemption question whether or not the employer can defend by showing it had the right under the collective bargaining agreement to do what it did. . . . The plaintiff's claim stands separate from this defense.
> We hold that *Lingle* and *Smolarek* save the plaintiff's claims from preemption. With respect to the discrimination claim, the right not to be discriminated against in employment decisions based on handicap or age is independent of the question of whether O'Shea was demoted or not. The plaintiff in this case

Indeed, this conclusion is buttressed by the realization that defendant's burden is only one of production rather than persuasion. After the plaintiff has set forth a prima facie case, Michigan courts place the burden of production on the defendant as a means of properly framing the dispositive issue, i.e., the motivation of the defendant, so that the plaintiff can then show that the purported defense was simply a pretext for discrimination.[7] Once again, nothing in this inquiry would require an interpretation of the collective-bargaining agreement.

Accordingly, because I agree that plaintiff's claim is not preempted under § 301, I join the majority's opinion and would remand to the trial court for further proceedings.

BOYLE, J. (*concurring*). I agree with the majority's result and concur with parts I and III of the opinion. The defendant essentially conceded that the collective-bargaining agreement did not entitle Mr. Krawczyk to retake the test.

---

may try to show, for example, that the midnight shift was undesirable and that older or handicapped employees were assigned to it more often than younger or non-handicapped ones. The defendant could then defend by arguing that it had the right to transfer its employees in order to improve its paper, just as the defendants in *Lingle* and *Smolarek* could argue that they had good cause to fire their employees there. The point is that Michigan employees have the right not to be discriminated against on the basis of age or handicap without regard to the collective bargaining agreement's language about an employee's rights.

See also *Hall v Kelsey-Hayes Co,* 184 Mich App 277, 280-281; 457 NW2d 143 (1990); *Welch v General Motors Corp,* 922 F2d 287 (CA 6, 1990).

[7] See *Burdine,* n 4 *supra* at 255-256. See also *Balwinski v Bay City,* 168 Mich App 766, 768-769; 425 NW2d 218 (1988).